and Delaware BSA, and we will begin, I believe, with Dumas. Thank you. May it please the Court. My name is Gillian Dumas, and I am here for the appellant claimant, and I'd like to reserve two minutes for rebuttal. The most important point I want to make today is that Purdue makes non-consensual third-party releases per se impermissible. Nonetheless, appellees argue that the appeal should be dismissed as statutorily or equitably moot, but neither of those theories applies in this case. And more important, under Supreme Court and this Court's decisions, an appeal is not effective, release is impossible. And appellees have not shown that release is actually impossible. And on the other hand, we have suggested possible release for this tiny number of abuse claimant appellants. Let me ask you, with those two different doctrines, neither of which really goes to federal court in a technical sense. Nonetheless, where we have a statutory mootness provision and an equitable one, is there a proper order for us to even conduct that analysis? Well, I think that the Court's analysis has to first decide if there are jurisdictional or if either of those two flaws exist in the plan, then mootness becomes irrelevant, because you can't – those things trump mootness. It sounded like you wanted to focus on equitable and statutory mootness. We can step back to Article III jurisdiction, if you'd like. Absolutely. I don't know which order the Court needs to hear them. You just need to decide them in that order, but I am happy to talk about that. The constitutional issues are pretty straightforward. It is that these claims that non-debtor abuse claimants have against non-debtor third parties, and when I talk about them, I primarily mean the local councils of the Boy Scouts and the chartered organizations that sponsored troops. Those are the third parties we're focusing on. Well, our claims, abuse claimants' claims against those third parties are property rights, they're choses in action. I'm not sure about the plural of that one. And therefore, they cannot be extinguished without the consent of these abuse claimants. And they, of course, do not consent. They're being taken away. We can't extinguish somebody's cause of action without violating procedural due process. There's a tort system alternative in the plan, but that doesn't nearly step in to satisfy the due process requirements. I think that's a merits argument. I thought you were also making the argument that the bankruptcy court didn't have related to jurisdiction. I have that, and I can speak to that, too. Yes, I believe that the bankruptcy court did not have related to jurisdiction. It certainly didn't have a rising in or a rising under jurisdiction. But even for related to jurisdiction, the bases that the court used to find that jurisdiction simply don't support it under this circuit's law, specifically the PACOR test for indemnity and this court's opinions in both Continental and Combustion talking about how shared insurance by itself is not enough to permanently enjoin the third-party claims. But I can go through the four bases that the court used. Here we have the debtors. They're sharing insurance coverage with the non-debtors against whom you wish to bring claims. And we have a fairly low bar in terms of conceivable effect. So how do you get around that? Conceivable, I agree. This is a tougher argument for us, but it is still important. The shared insurance factually does not apply to all the claims here. So even if it was enough to give basis for jurisdiction for some of the claims, the shared insurance only came into existence starting in about 1976. So the plan makes a distinction between post-'76 claims and pre-'76 claims. If shared insurance is the basis, that doesn't apply to either local councils or chartered organizations prior to 76. However, the court still exercised jurisdiction over all claims against local councils but excluded claims against chartered organizations that arose prior to 76. That was the correct decision because the court found that there was no shared insurance prior to 76, so there's no jurisdiction over those pre-'76 claims against chartered organizations. But then the court clawed back that exception by saying that the court was exercising jurisdiction over pre-'76 claims against chartered organizations as long as the policies they bought themselves, not shared with BSA, but their own policies, were issued by a settling insurance company. Well, there's no jurisdiction over claims that don't involve shared insurance, and the settling insurer's desire for a global resolution does not create that jurisdiction because it doesn't create a shared asset. Even so, wouldn't the upshot just be that the district court needed to make findings of fact and conclusions of law? Yes, but it did on that point, and those conclusions of law, that there was a shared asset that gave the court jurisdiction, at least for those pre-'76 claims against chartered organizations, that is simply wrong. And, of course, jurisdiction is decided de novo. So that shared insurance isn't enough, certainly for those claims not covered by shared insurance, which I believe is also claims against the local council prior to 76, definitely chartered organizations before 76. But I think it's more important to focus on this court's rulings in Combustion and Continental that said that that shared insurance, it might be enough to enjoin the claims while the court is giving its arms around what the bankruptcy estate is, but not enough to permanently enjoin the claims. And that makes absolute sense because these chartered organizations and local councils, prior to 76 when they didn't have shared insurance, they had all their own assets, including their own insurance, and those assets and insurance still exist. So it might be possible for the court to have exercised jurisdiction over those shared policies, sufficient to extinguish those policies and any claims that local councils or chartered organizations could bring against the debtor based on those, I think the court had jurisdiction over those. But the court didn't have jurisdiction over the third-party claims that were not covered by the shared insurance. And I think those claims should have been allowed to go forward. And by exercising the jurisdiction over those claims not covered by shared insurance, the court made the wrong legal conclusion. Has there been substantial compliance? No, I believe that no. As for equitable mootness, you mean the substantial consummation? Which is the better way to look at this, the equitable mootness doctrine or the statutory mootness? Either way, I believe that neither of those theories applies here. There has not been substantial consummation of the plan because even though it went effective, that three-part statutory test that the court uses to decide if there is substantial consummation, the elements of that have not been met because the first step is have all or substantially all of the assets been transferred? And so far only 40% of the assets have been transferred. That's obviously not substantial. That isn't even the majority. Where does the escrow fit in? And then the escrow, there's the 11th Tenth Circuit case that the appellees cited for that was actually different than here because in that case money had been put into escrow, but title had transferred to the trustee. Title to this escrow money has not transferred yet because it's subject to being returned to the settling insurers if the case is modified on appeal or reversed on appeal. So, therefore, that money that is in escrow is not under the management control of the trustee, the successor. So those are the first two steps of substantial compliance that have not been met. Even not meeting one of those is enough to find no substantial consummation. But two of them is certainly a death knell. And then the third one. Would you agree that, by definition, transfer under the code includes every mode, direct, indirect, absolute, or conditional, and that this transfer into escrow was a conditional transfer, which satisfies the definition of transfer? Well, there's a lot of assets that simply have not been transferred. The money from the settling insurers is the bulk of it. I'm talking about the definition of transfer. You would agree, would you not, that what's in escrow has been transferred under the code? I believe that because it's conditioned to return, that it hasn't actually been transferred, even under the code's definition, because that money isn't the estate has no control over that money in escrow, and it is going to go back to the settling insurers. I think that by making it conditional on the outcome of the appeal, the appellees have waived any arguments about statutory or equitable mootness because they're going to get the money back. The terms of the plan are consistent with finding no substantial consummation because the money is not just going to be sitting there waiting for the outcome, but it's going to go back to the settling insurers if the plan is modified. I want to make sure we're using the same consistent terminology because we've talked about equitable mootness as including substantial consummation, the unscrambling, and the reliance interest. But it sounds like when you're talking about substantial consummation, you're talking about that in terms equivalent to the application of equitable mootness itself. Because I don't believe the substantial consummation concept applies to statutory mootness. The statutory mootness, I think, is also not a good theory here. Neither one of them are a good theory for the fundamental reason that no case is moot if effective release is possible. And effective release is possible here. So I don't even think we get to the sort of substance of the mootness arguments, or at least they are secondary to the fact that cases still shouldn't be dismissed because release is possible. But for the statutory mootness, I believe Section 363M does not apply anyway because the sale is not complete. The sale is contingent to be reversed. So, again, the terms of that sale contract are consistent with the appellate process. And then, of course, the sale was not a 363 sale because it was part of the confirmation process. It was not done under Section 363. There was no notice. There was no separate sales order. It was all, and it wasn't to a third party. The sale was done only in the confirmation process and incorporated into the confirmation order and the plan itself. But we've already held in cases like energy future holdings that being part of the plan itself doesn't take a sales order outside the context of 363. That is the holding of energy futures. But energy futures is factually different because that sale was complete. There was a separate 363 sales order, a hearing and order that was later incorporated into the plan. But it was still a separate 363 sale. This one- Here's the confirmation order itself. The bankruptcy court says that the settling insurers are good faith purchasers for value under 363M. It seems to have thought it was authorizing the sale pursuant to 363B, right? It did. But Section 363 is not that broad. It can't be completely engrafted into plan confirmations and used to protect any plan no matter how unlawful, no matter how much it contradicts something. It can't be used that broadly to insulate any bankruptcy plan from appellate relief just because it includes a sale. That would abrogate the appellate court's Article III powers to effectively supervise bankruptcy court decisions. Why do we have to talk here about its effect on the plan? Can't we just focus on the particular sale that's being challenged? That is the buybacks where the application on the merits of Purdue would mean that the consideration in that transaction was voided, which would necessarily affect the validity of the sale. Why isn't this much more narrow talking about the sale itself rather than opining about broad consequences? Here it happens to be that that sale is the centerpiece of the plan. But why would this be generalized to its effect on all plans? Taken to its logical conclusion, that would be the outcome. But even here, again, we're not appealing the sale. We're appealing the plan. The plan, the sale is part of it. There's a big argument. Is it the nonconsensual third-party releases that are the cornerstone of the plan? Well, or, I mean, the sale itself is not the cornerstone of the plan. It provides a great deal of funding for the plan, but the key to the plan are these nonconsensual releases that Purdue said are per se impermissible. And I don't think you can look to an incompleted contingent sale to then leapfrog to the point of saying those incomplete contingent sales can somehow protect clearly unlawful nonconsensual third-party releases. My red light is on. Anything? Thank you.  May it please the Court, I'm Delia Lujan Wolf. I'd like to reserve five minutes of rebuttal time. I represent the Lujan claimants who are 75 individuals who brought prepetition lawsuits against the Boy Scouts of America, the Aloha Council, and other non-debtors, including DOE insurers. And under Purdue, this plan is clearly unlawful. Nobody can bargain away my client's claims without their consent, not even other survivors more interested in achieving their sense of finality at the expense of my clients and other survivors. This case is not equitably or statutorily moot. Purdue fully applies to the plan. And if I could just start with equitable mootness. That doctrine does not apply. Clearly, as stated earlier, most of the property has not been transferred. It's in escrow. It hasn't been transferred to the trust. It's in escrow for a purpose to allow for the return if the plan is reversed on appeal or modified in some way. Well, a number of our cases seem to look at that first step as essentially the definition of substantial consummation within the statute. And granted, there are then other steps that we need to look at and look at carefully, including third-party reliance and what that means here. But focusing just on that first step and what substantial consummation means, haven't all or substantially all of the assets been transferred under the definition of these terms in the bankruptcy code? No, because there's a difference between the $189 million that was actually transferred to the settlement trust, the ultimate destination of the property, and the $1.4 billion that's been held in escrow. And that is not the ultimate destination. So there is a difference. But where in the statutory definition is there anything about the ultimate destination? I mean, to the contrary, doesn't it refer to interest being transferred when it's contingent, it's conditional, even partial? Well, I can't answer that now, Your Honor. But we've cited case law in our briefs, which makes clear that even when it's in escrow, that is not a transfer for substantial consummation purposes when looking at the equitable mootness doctrine. Isn't the common sense meaning of transfer that you start with you are parting with the property, you are getting it away from you, you're transferring it? As Judge Krause said, it doesn't really say ultimate definition. They have parted with it. They no longer have it. You have transferred it. What is it that says ultimate destination is required? It doesn't explicitly say that, but there's a difference between what has been actually moved. And in this case, I mean, what's in escrow is to ignore the purpose of escrow. The point of it is so that the trustee doesn't get it. That's why it's in escrow, so that the trustee doesn't get it. And so we don't have that. We obviously don't have control. That's a second requirement for substantial consummation by the trustee of all these assets, including those escrow funds. The equitable mootness doctrine conflicts with recent Supreme Court case law. We have the court there looking at 363M, a statute which explicitly limits relief on appeal. The court said there that judicial power over the covered authorization still needs to proceed. You know, it takes it as a given even when you have an express statute limiting relief. In order to limit adjudicatory capacity of appellate courts, there has to be a clear intent by Congress to make it a jurisdictional limitation, which 363M is not. With equitable mootness, there's no statutory basis or other legal basis at all to support limiting the court's adjudicatory capacity. Our precedent recognizes equitable mootness doctrine, does it not, in our court? It recognizes it, but the court has the power to change precedent if it conflicts with Supreme Court case law. And it does, it conflicts with Moak Mall as well as Purdue Pharma. In Purdue, the court stated that it's all up to Congress to decide and not for the courts. The arguments of prudential considerations that were raised in Purdue mirror those that are raised by the appellees and amici here. And so in Purdue, those prudential considerations of fairness were rejected as not overriding the statutory scheme that only a debtor gets a discharge. On the other hand, the Supreme Court has had the opportunity to take up equitable mootness. Maybe it will again, but as of now, it hasn't squarely addressed it. And we have our own circuit precedent on that doctrine, notwithstanding some criticism on occasion. But since we have to apply it absent en banc review, take us to the next piece of the analysis. That is, if we are looking at transfer and substantial consummation as satisfied, given the low bar that seems to be set by the terms of the statute, if we looked at the statutory definition, what do we do when we get to third-party reliance? And whose reliance is relevant for those purposes? The Third Circuit has made clear that it's primarily outside investors when securities have been issued. In this case, and there has to be clear evidence. There has to be evidence in the record of outsider reliance and significant harm that would be suffered by these outsiders. And in this case, we only have self-serving speculation issued or offered by the appellees. We have some survivor amici who have come forward who are creditors. They're parties in interest who had the opportunity to participate in the process. They're not outsiders. The appellees have just, you know, they said we've done these transactions, but they've not come up with any declarations or affidavits from any outside investors or anyone other than their financial consultant, who is not an outsider, to show that, you know, they relied on this plan and that they would be harmed if there was some modification or reversal. What precludes consideration of the extent of distribution that's already occurred? If we look at the number of claimants who have come forward for the expedited distribution procedures or under the matrix or those who have put in their questionnaires and their documentation, what role should their reliance play? So the debtors have the burden to prove that funds that have been distributed cannot be disgorged, that things cannot be retracted. And so there's a complete lack of evidence that funds given cannot come forward. Nobody who's received has said that they cannot give back. And so there is total speculation on the part of the appellees. The Third Circuit has looked at, you know, at disgorgement of what's been given, even if it's not disgorgement. And found that that's, you know, that that doesn't, that doesn't mean equitable mootness applies. I mean, it can be disgorged. Let's say, what would happen as a practical matter if this plan were overturned? There would be a liquidation, would there not? I mean, we now have a reorganized debtor with the Boy Scouts of America functioning. We have new directors. We have institutions that are operating. What would happen as a practical matter if this plan were undone? So before I answer that, it's also possible that the whole plan does not have to be undone. But in the event that the court decides to undo. What would that look like? What are you saying would happen? What happens here? If the plan is not completely undone, that would be granting limited relief to the Lujan claimants. That could be in the form of striking certain releases so that the Lujan claimants could proceed. For example, a debtor. You're asking for partial relief or are you asking for the plan to be undone? I'm confused. I thought you wanted the plan to be undone. The confirmation order to be reversed. We've asked for reversal, but we've also asked for modification of the plan, and we've identified. What would happen if it were reversed? Your theory is that it should be reversed because the releases are unconstitutional, et cetera. So if that happens, what does it look like? If the plan is reversed, then there's already precedent. I guess the general rule is that when a judgment is reversed, you go back to the pre-judgment status. All the money gets returned, and now there will be suits left and right against the institutions, the local chapters, et cetera. I mean, is that really what's going to happen? I mean, it's going to implode, is it not? No, it's not going to implode because even the Boy Scouts had testimony that a BSA-only plan, where only the BSA, the Boy Scouts of America, gets a discharge, is feasible, that it's something that remains on the table. If this plan is reversed, then the Third Circuit has recognized that a so-called reorganized debtor can go back into being a debtor in bankruptcy if it's reversed, and they have to come up with, under Purdue, a BSA Boy Scouts-only discharge plan. Under Purdue, that's appropriate. Yes, there may be lawsuits filed against non-debtors, but that's not something for bankruptcy courts to resolve. The Boy Scouts went forward with this plan, knowing since 2021 that these channeling injunctions, barring non-debtor claims, were highly doubtful. That's what Hartford, in a letter sent to the Boy Scouts, that's what they said, that it's highly doubtful that these channeling injunctions will be granted because the liability of the non-debtors appeared to be direct and not derivative of the Boy Scouts' liability. And so we have the debtor, we have these appellees. Everyone here participated in the process, knowing that there was a high chance, not even just looking at the circuit split, but that these were direct claims and not derivative claims. And so they took a chance, and that's why we're here today. This case progressed against the backdrop of Purdue Pharma. Judge McMahon in Purdue... Well, there was no, the search petition wasn't even filed at the time that their plan was confirmed. And I don't know. I mean, I was a bankruptcy practitioner. Third-party releases are really, really helpful in bankruptcy cases. And sure, there's always been a question, but there's been a question about a lot of things. And, you know, Purdue really came down pretty hard. It's going to be interesting what it does in bankruptcy practice, but I don't think you can say that everybody knew that it was writing on the wall here. Well, even not looking to the statutory authority, they knew from prior case law that when a survivor of abuse files a lawsuit against the Boy Scouts or a local council or a chartered organization, that oftentimes that, you know, the Boy Scouts, there would be a different result for the Boy Scouts of America of the local council than the charters. The chartered organization could be found liable but not the Boy Scouts of America. The local council could be found liable but not the Boy Scouts of America, and vice versa. Even so, why doesn't that just make this appropriate for 363M, where what we're looking to is a narrow consideration of the particular sales at issue here with the buybacks in exchange for the third-party releases. And Congress has provided, so we're not turning to a broad equitable mootness doctrine or expanding the realm of third-party interest, but just looking to the good faith of the purchaser. And we have a finding here, right, from the bankruptcy court that the insurers were good-faith purchasers. At the outset, it's important to note that the sales of the policies are only, it's very limited. The sales of the policies are only of policies that were bought by the Boy Scouts of America, the BSA abuse insurance policies, and the policies that were bought by the local councils, not any policies that were bought, separate policies that were bought by chartered organizations or Roman Catholic entities that are not chartered organizations. Aren't they assigned? I'm sorry? Weren't the others assigned? They were not actually assigned. There's no actual written assignment by anyone. The insurance settlements simply endowed settling insurers with injunctions so that survivors couldn't sue a chartered organization. If the settling insurer happens to have sold separate insurance policy to the chartered organization and the Boy Scouts didn't share any interest or rights of coverage under that. I understand the argument that you had raised in your brief, because you assert at page 30 of the supplemental brief that the local councils and chartered organizations' insurance rights will be assigned to the trust in the future. But the plan seems to provide that that's part of the interests that are vested in the trust as of the effective date. So under the plan, if no one comes forward to object, then it's somehow an assignment or a transfer. I'm sorry, I wouldn't concede that. Because actually it's an assignment at most of their interest in the policies and not actually an assignment of their separate policies, the chartered organizations or the Roman Catholic entities. I don't believe that those are being assigned. But settling insurers just gave themselves additional protections, including when the Roman Catholics dropped their objection during the confirmation hearing and then enjoyed the benefits of nobody getting to sue them if a settling insurer happened to have provided them with their separate insurance policy. They contributed nothing. The money that was paid on the insurance sales remained the same before the settlement and after. And so what we have here, it's important to remember, that these sales are only sales of Boy Scouts and local council policies, and yet the insurance settlements go beyond that and they take away survivors' claims based on the settling insurer's provision of insurance to chartered organizations and Roman Catholic entities. Those are not being assigned. And so if 363M does apply, which I would like to argue that it does not, but even if we would assume that it does apply, built into the insurance settlement is that even if the confirmation plan is reversed or the plan doesn't go to a final non-appealable order, they argued in their reply brief in support of their motion to dismiss that if that's the case, then the sales remain valid, but they get back the 750M. So the settling insurers, if the plan doesn't go to a final non-appealable order, they get back the S-quared funds because they say that they get less protection now, and because they're getting the S-quared funds back and it's not going to the trust, they do not become protected parties under the plan. That means under these insurance settlements, built into it already, is that the settling insurers do not become protected parties. They are exposed to suit their survivors, like my clients would be able to directly sue them because we have rights of direct action. Only if they're a protected party are they protected by the injunctions. Go ahead. You said that Section 363M doesn't apply. Could you explain that? Yes. So 363M does not apply because this is a planned sale. The sales, the insurance settlements, were completely dependent on one order and that being a confirmation order. Unlike energy future holdings, there was no separate pre-confirmation order that was tied to the plan. And so the Third Circuit, I believe it was ICL, is one of the cases. The Third Circuit has stated on more than one occasion that a 363B or C sale is a sale outside of a plan of reorganization. Section 363 itself distinguishes, if we were to interpret Section 363, it distinguishes between a sale of property under Subsection B or C and a sale of property under a Chapter 11 plan. In Subsection L of Section 363, it specifically identifies these as different transactions. It says that a trustee can sell property under Subsection B or C or a plan under Chapter 11 can provide for the sale of property. And so the only way to interpret this and not render the language superfluous or insignificant is to interpret it, Section 363, as saying that these are two different transactions. A plan sale, which is under Section 1123, is not a sale which is under Subsection B or C. And that interpretation is supported by the DITEC holding case, which is a Southern District of New York case. I believe that was 2019. And in that case, the court interpreted Subsection O of Section 363. And Subsection O, what's important about that is that originally, when Congress was adding Subsection O to Section 363, the original language said that this section would apply to a transfer by a trustee or a transfer under a Chapter 11 plan. And Congress decided to remove reference to transfer under a plan and then kept only that Subsection O applies to a sale under Subsection B or C. And the DITEC court interpreted that to mean that a sale under Subsection B or C is not, that Subsection O does not apply to a plan sale but only to Subsection B or C sales, which this is not. The sales here are not outside a plan. They are squarely within the plan and dependent on plan confidentiality. And those in-ring energy future holdings and Senecola versus Sharpsburger, that a sale within a plan can also qualify under 363, right? And we've already crossed that bridge, haven't we? No, I don't think so. First of all, the statutory arguments have never been raised. I think probably the first to raise it. I haven't seen it. And so the court didn't analyze the language of Section 363 in light of Subsection L or even of Subsection O. And so I think from the statutory construction, it's clear that these are different transactions. If it's a plan, a sale under a plan, and it doesn't even say Section 1123 in Subsection L or Subsection O or, you know, the original language of Subsection O, it talks about plan, transfers, plan, sales. And these are different transactions. Congress knew when to include, transfer their sales under a plan. They knew when to include it. They knew when to exclude it. And with Subsection M, they decided to not include sales or transfers under a Chapter 11 plan. Subsection M only applies, therefore, to sales outside of a reorganization plan, Subsection B or C. Thank you. Do you have other questions? I don't. I'm sorry. Okay. My time is up. Thank you. We'll hear from everybody. May it please the Court, I'm Joseph Bail, arguing on behalf of the certain insurers. And, Your Honor, with your permission, I will reserve two minutes.               Also, I will divide this presentation into two parts, the equitable and statutory mootness as to our appeals first, and then the merits of our appeals second, if that works. So on the equitable and statutory mootness, Your Honor, I begin by focusing on the unique aspect of the insurer's appeals in this case. We are not seeking to unscramble the plan. We are not seeking to unwind existing transactions that have already occurred. We are simply asking for specific relief that will address the fact that this plan does not preserve and, in fact, decreases our contractual rights and expands the trustees' rights in violation of the law. But can we look so narrowly at, just the language you'd like to add, don't we need to look at the effect on the plan as a whole and whether that's going to be viewed as a modification of the plan? What consequence would that have, for example, for funds in escrow? Well, I think we have no impact on the funds in escrow, Your Honor. That is, if our relief is granted, that does not trigger the return of the money. In fact, the settling insurers did not say that our relief will adversely affect their right to proceed. They don't say that in their brief, and there's a very good reason because we are not trying to or seek, and there isn't a repercussion that from our relief there would be an unwinding of that transaction. That's just not in the cards. Now, you know, Tribune teaches us that really you look at each party's appeal, and you make an evaluation of whether, in one case, it's equitably moot because they're seeking to scramble the plan and they're interfering with third-party rights and other consequences, and at the same time they look at another appellant who is not seeking that relief to evaluate whether equitable mootness is appropriate or not. Mr. Mayor. Yes, Your Honor. It's my understanding that you want it to be crystal clear that the obligations under the insurance policies continue. Well, it's not. Doesn't the plan explicitly assign all rights and obligations under the insurance policies at Appendix 1017 and 1033? Isn't the relief you want really already in the plan? Your Honor. Maybe you need to understand better exactly what you want. Very good. Your appeal is granted. What will happen? Yes. Okay, Your Honor. First of all, the plan in the definition of the insurance assignment, which is Plan Paragraph 157, it only refers to the rights, claims, benefits, or causes of action of the debtors, and it does not talk about and does not include the word obligations that they would have. The point of that, and really the proof of the pudding, is in the lawsuit that has already begun by the trustee. The trustee cites at Paragraph 110 of her complaint that this exact language, the rights, claims, benefits, causes of action, have been assigned. And then in a footnote, Footnote 2, lays out the exact language. Nowhere is there any recognition in that pleading that the insurers have rights and have defenses that are available to them. In fact, there is a later paragraph that affirmatively says that we don't have those rights. Well, isn't that because that's just the default background rules of bankruptcy law? Why does that need to be spelled out explicitly in the plan? Well, there are a couple of problems with the language I just read. First of all, it violates the com honore principle, which is set forth in Third Circuit case law. That is, you may not transfer from the debtor to the trustee anything other than the rights and the obligations. That must be transferred. What the trial court did, what the bankruptcy court did, was say, well, I'm going to approve this transfer, which doesn't talk about obligations, but I can't say as a matter of bankruptcy law whether that's permissible. That's on pages 249 to 252 of the bankruptcy court decision. She says, that's not up to me. Well, but we say, of course it is. It is a bankruptcy provision that says that you may not transfer. That's the American Home case. You cannot transfer the rights without the obligations. That's what we asked the court to say. What the court said was, I can't address that. I can't tell you what was actually assigned. I'm going to leave that to the coverage court. But that's not a coverage court issue. I'm looking at appendix 1017. Yes, Your Honor. Let me get that if I can. C. 1017C, yes. And also 1033. And 1033. Yes, Your Honor. It says rights. I'm down at about halfway down, C. Rights and obligations. And under 1033, article 10, rights and obligations. Why is that not sufficient? Well, Your Honor, what C does, it talks about the bankruptcy court has authorized the insurance assignment. Okay? Let's start with that. The insurance assignment is only about rights. When you look at that term in the plan, paragraph 157, it doesn't talk about obligations. It only talks about the rights of the --. No, and I'll go on. Yes. The rights and obligations of any non-settling insurance companies relating to insurance policies and the applicable law. Except it doesn't stop there, Your Honor. It then goes and says, and subject to the plan and confirmation order. So now all of the insurance --. Do we have anywhere a proposed modification of the plan that you want to put in here at C or that you want to put in at article 10? Yes. Or something that you want to insert? Absolutely, Your Honor. Let's take first the assignment of insurance rights. Where do I find that? Oh, it's in our briefs. We talk about removing the language subject to the plan and confirmation order. It's simply striking that. Because our rights and obligations cannot be subject to the plan, which is designed to do something else, which empowers the trustee to pursue the insurance companies. But the trustee, unlike the policy holder, has a fiduciary duty to the claimants. It must decide what to give the claimants and has a great deal of discretion in doing that. So subject to the plan and confirmation order means that the trustee can argue, as she has, that, well, I'm acting pursuant to the plan when I dole out money to claimants and I have a fiduciary duty to them. So therefore, you insurance companies must pay, irrespective of your defenses, irrespective of the conditions, irrespective of whether the trustee has complied with its obligations, where it's in the policy, to cooperate. And otherwise, by making it subject to the plan and the confirmation order, it has already diminished our rights. Because now the coverage court is told by the federal court, take these 600 pages of documents and evaluate the extent to which they diminish the insurer's rights. So all of the language that's in here that empowers the trustee, that says that the trustee must be fair and equitable in dealing with the claimants to whom they have a fiduciary duty, well, that should have no part whatsoever in the decision as to whether there is coverage. Those are two separate things. And if the coverage court has to start evaluating, what did the confirmation order do, because I'm told by the federal court that all of the rights of the insurers are subject to the confirmation order and the plan. Now that's a burden that can only redound to the insurer's detriment. There's nothing in here that actually gives the insurers rights. It's all about what the trustee can do. So we have a diminution as a matter of fact by that language. To then say that you have a dispute with the trustee as to what this language means. She's taking a certain position as to that. You have a different position. Sounds like a dispute that you have as to the meaning of the terms contained in the plan. It's not a difference, Your Honor. We're asking this court to read the plan and this court the language, just like it did in combustion engineering, where the court looked at the language and it talked about claims on one hand and it talked about rights on the other hand, and said claims are less than rights. Therefore, you are not preserving the insurer's entitlements and defenses. So we, the Third Circuit, you, the Third Circuit, will tell the bankruptcy court, you must change that language. You must revert to the broader language that affirmatively protects and preserves fully, is what the combustion engineering court said, preserves fully the rights of the insurance company. This is the opposite of that. You know, we've given you lots of language, Your Honor, from other cases. And by the way, you asked about others. I can talk about the other two specific changes that appear in many, many plans that clearly protect the insurers. For example, our plan says that the rights of the insurers are subject to the plan and the confirmation order. That means that our rights can be diminished by whatever is in the plan and confirmation order. The decisions that we cited, although they didn't address whether it's appropriate or not, but they include the opposite language. Notwithstanding anything in the plan or confirmation order, the insurer's rights remain preserved. That's what they said. That's what they say in global industrial. That's what was said in federal mogul. That's what was said in combustion engineering. And combustion engineering says that there is a duty to preserve fully the rights of the insurers. This has done exactly the opposite. But that's just the state of the law. I mean, it's well settled that bankruptcy law isn't altering the party's contractual rights. It's not to the extent that it would do something different than outside of the Right? I mean, you seem to be – combustion engineering, the court was taking out language, and that had significance. So our instruction to put language in was to make clear that we were going back to the default principle. But why do you need a change in language in the plan here to just have the default background principle of bankruptcy law? Well, there is no – the background principle in mission, the Supreme Court decision, is that neither the debtor's rights under a contract expand, that the rights of the other party decrease, that the estate suddenly sits in a better position than the insured or the policyholder was in as a result of bankruptcy. You see, that's the principle. There is no alteration other than what is expressly identified in the code, not in the plan, in the code. So when the district court said that you're not harmed by this language, you'll see that on page 74 of the district court's decision, because under the code, you – there is an overcoming of the anti-assignment provisions. Therefore – and it says that's an example of one of the diminutions. It's the only diminution, in fact. But it says then that – and that's why we say that the plan rules in determining what your rights are. But that makes no sense. The reason that we – that there is an override of the anti-insured – the anti-assignment provision is because of the code, not because of the plan. If they're simply trying to preserve the right that we cannot stand in the way of assignment of proper parties, proper policies, naming the estate as a covered party or as the counterparty, then we don't adversely affect the insurer. But you don't need the plan for that. That's a matter of law. That's a matter of federal mogul. That's a matter of statute. So why do we then foist upon the coverage court 600 pages and 300 pages of decision law where the court said, oh, no, their rights are all subject to the plan and the confirmation order? In addition, we have affirmative evidence that there is a statement that we are bound in the coverage court by whatever happened in the bankruptcy proceeding. Well, that really isn't true. And what we're asking for is very narrow in terms of the relief involving the additional two points that we want to add. One of them is that anything that happens in the bankruptcy court is not raised judicata as to whether there is coverage, period. That's what that language says. Now, we know that the FCR says, oh, that's not true, you're bound by what happens, raised judicata, collateral estoppel applied in the coverage action. No, it does not. We did not litigate anything in coverage. And all of the plans that I've identified in our briefs, they have a provision that global industrial lays it out in purple, that there is no raised judicata on coverage as a result of what happened. We're not saying that raised judicata in its entirety disappears. The other element that we're asking for is because the trustee has actually awarded something to a claimant pursuant to the plan, that itself does not adversely affect us in the coverage court. Those are the only two additional provisions that we are asking for. And they were specifically proposed by the debtor in this proceeding before they had to get 75% of the votes or more of the claimants who added this language. Even the bankruptcy court recognized that this was done at the request of the  So another thing I have to mention, Your Honor, is the truck insurance decision, which came down after our briefing by the Supreme Court of the United States. What that court says, of course, is that you can't use insurance neutrality adversely. You can't make that a barrier to recovery. But what you must do, and they tell the Fourth Circuit, you must do the following, and this is language directly from this court's finding, even though it was an appeal from the Fourth Circuit. When a debtor is reaching in the pockets of another, that party has the right to be heard and the right to have justified grievances addressed. It's not just being heard in the wilderness. And what the truck court did was many things, but it said that there are a myriad of ways in which insurers, a specific insurer case, can have their rights adversely affected. And they identify a bunch of them. And what they did was, and by the way, that's a good faith case under 1129, the court remanded it to the Fourth Circuit to reevaluate what they decided based on the decision that was written, which identifies the practical effect on insurers, the reality that the motivations of the parties changed dramatically as a result of a bankruptcy. Before the bankruptcy, the policyholder has no duty to the claimants and only litigates adversely, no fiduciary duty, and wants to minimize exposures. Once you go into bankruptcy, now in these mass tort cases, there is suddenly a duty that runs from the trustee to the claimants. The claimants who are part of the group, and this is just the reality, they want to maximize whatever they can get from the insurance company. The court recognizes the realities, that is the truck court, in evaluating what goes on. And they specifically say, as a result, you really have to pay attention to what this is doing to the insurers, the myriad ways in which this can have an adverse effect, and evaluate that, and make a determination consistent with what our opinion is telling you. So we're not, and that's to get back to equitable and statutory mootness. Statutory mootness, we're not doing anything with that transaction. The settling insurers understand it, and that's that. In terms of equitable mootness, which is supposed to be rarely granted, is an extreme exception to a court, an appellate court, addressing the merits of an appeal. The focus, a good part of the focus, is what impact does it have on third parties that rely? We heard about real estate transactions. We heard about donations. We don't want to touch any of that. So what we want is that very limited, focused relief. And Judge Rendell, if I haven't made it clear what the language is, it is in, specifically, in our reply brief. Okay, laid out. So I don't want there to be any confusion about how narrow it is, and how the language that we propose actually was proposed by BSA originally. I think we understand the argument. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Harris Winsbrook on behalf of the Alliance Insurers. Our appeal concerns the Alliance Insurers' claims, including claims that were pending as of the bankruptcy filing in an Illinois coverage case against other insurance companies that had settled in the bankruptcy case, and how these inter-insurer claims are dealt with under the plan, and in particular, the judgment reduction clause that's found in paragraph 51 of the confirmation order. Can you tell us, to this point, how much have the Alliance Insurers actually accrued in excess claims? Your Honor. The reduction clause? Yeah, Your Honor, the excess claim will be generated. We wouldn't know what that would be until a future coverage determination. As far as defense costs are concerned, we are incurring defense costs. The Settlement Trust filed a declaration, I think it's a docket 206, where Settlement Trust being acknowledged that there are independent review cases going on, and potentially responsible insurers are participating in that, and the Alliance Insurers are part of that. So we absolutely are incurring defense costs underlying cases in the independent review process right now. As far as I'm aware, Your Honor, there hasn't been an opt-out under the TDP to go to the tort system, but that would be the other example we gave. We're not aware of one of those happening yet. But the IRO, we are incurring defense costs at this time, Your Honor. But as to the Settlement Trust or settling insurers, to this point, there's nothing quantifiable in terms of them not covering their fair share of their costs? Your Honor, pre-bankruptcy in the Illinois case, there was an insurance settlement of one of the abuse claims that Alliance Global Risk funded. I believe it's called the Rahi Settlement. I'm not sure that's technically in the record here, but you could take judicial notice of the proceeding in the Illinois coverage case. And there was a settled claim that we contributed, and then we brought a counterclaim, which is the subject of the Illinois case. And there's a competing case in Texas, which Mr. Bail referred to. How do we know the magnitude of the impact of what you're requesting? Your Honor, we don't know specifically. We put evidence in the record below that 90% of the aggregate liability resided with the settling insurers. We also have evidence in the record below that Century and Hartford, which were the primary insurers, historically defended these claims pre-bankruptcy. Now, part of their settlements, they're no longer there. So these claims otherwise would be undefended. So we have elected to associate in. We don't have the obligation to defend, but we have a right to associate in to the defense, and we have exercised that. But to Your Honor's question, it's unknown at this time. The debtor has said that it's speculative, hypothetical, unlikely. The district court made a finding, the bankruptcy court did not make, made a finding that the likelihood of substantial defense costs was reduced, therefore rendering the protection adequate. Not full, but adequate under a framework which we believe has no application here. But to answer your question, Judge, we don't know the magnitude of it. The other thing I would point to in the response to our, in the support of the debtor's motion to dismiss this case as equitably moot, they submitted a declaration of Mr. Whitman. And Mr. Whitman said in his declaration that the trust will have to reserve for these potential claims. And that was their harm. But what Mr. Whitman didn't say, well, number one, Mr. Whitman doesn't work for the trust. He works for BSA. So he had an objection to that that we put in our paper. But what he doesn't say is how the trust, is how reserving for these claims will fundamentally alter the economics of the trust. He doesn't say anything at all about it. He also doesn't say whether it's going to impact abuse claims at all. And the district court and bankruptcy courts have findings below that it's more likely than not that abuse claims will be paid in full. And all we're asking for is to have the right to assert a claim against the trust. Now, what we did say at the bankruptcy court level, and we suggested the language, Your Honors, and we put that on Exhibit A to our opening brief, the language we want, which we had crafted from a decision called our SARCO. We shortened it. But that's where we got it from for a trust backstop. What we did say, that if it turns out that the trust is only going to give up, say, 50 cents on the dollar, that we would get the same. This isn't a situation like plant where the insurers were asking for 100 cents on the dollar and the specialist claimants were getting 10 cents on the dollar. We're just looking to have the right to access it. And we would know, you know, I'll stop and go talk about the merits, or I'm happy to answer your questions on that point. To the extent we have the determination that you refer to in the record that because of the availability of, you know, alternative dispute resolution, et cetera, this is not going to be a meaningful problem. And that does not appear to be based on any evidentiary findings. Would the right step for us as a remedy, if we agreed that there was an issue here, be simply to remand? Your Honor, I think when we filed the appeal, we filed it due to the least amount of damage to this plan. We do not want to unwind the plan. This wouldn't impact any of the plan transactions that have been proposed. We did cite, to Your Honor's question, we cited the Gerber decision, which Judge Sotomayor, before she went to the Supreme Court, she blue-penciled the bar order, saying judgment reduction is a bad vehicle to pay these claims. It just doesn't work. And Gerber says that, and Binda says that, and Greektown, all the circuit cases we say talk about those points. And to your question, we would submit, Your Honor, under the Gerber decision, you could fix it on appeal and not have to remand. If you wanted to remand, that's certainly the other way to handle it, but we think this could be cured with you. You have the power and the ability to just blue-pencil it, and I would cite to you the Gerber as the authority for that. The lower courts found that the plan would result in reduced coverage costs overall, and your proposed blue-penciling of this clause really reduces costs even further. Isn't this kind of an unfair windfall on your part? No, Your Honor. We don't believe it's a windfall. Number one, the district court, unlike what the FCR said in the brief, the district court never said we got a windfall. The district court never said we were being paid in full. All the district court said – my time is up – all the district court said was that your defense costs are likely to be reduced. But there was nothing in the record for that. But even if that's true, then he went to say, well, the protection is adequate. But that doesn't work here, and it's not a windfall, because that was based on the decision on plant, which I've already said is factually distinguishable. But plant was strictly based on 524G and a specific statute that said you could extinguish these claims because the injunction did not require compensation for these extinguished rights. That statute under 524G does not apply here. And under Purdue, Purdue has made very clear that whatever the merits of 524G are, they're tabbed into 524G. So in this case, which is not an asbestos case, we would submit that it's not a windfall. In fact, it's getting the relief we're entitled to under the law. Even the Bendis court talked about, even if you believe these claims aren't likely, you shouldn't bar them. They go on to say that you should preserve them. You should modify the bar order to do so. And that's all we're effectively doing here. So we don't believe there's a windfall. There's nothing in the record to support that. And all we're looking to do is to – we didn't challenge the injunction as the settlement insurers. We're not attacking their settlement. We just want to have a backstop. And I think that Gerber, Bendis, and Great Town teach us that a backstop is the appropriate way to handle in this case. And, of course, Purdue says these claims cannot be released without our consent. So this is the proposed fix we have for where we are in this appeal to preserve our rights and do it in a way that does the least amount of violence, said the Boy Scouts. Okay. Thank you for your time, Your Honor. Thank you. May it please the court, I'm Michael Houston on behalf of the Reorganized Boy Scouts of America and the planned supporters. I'd like to begin by just laying out how appellees are going to present to the court this morning. I'll be addressing why this court's equitable mootness doctrine and Section 363M of the Bankruptcy Code preclude appellants' requested relief. Mr. Anker and Mr. Hacker will discuss Section 363M from the standpoint of the insurers who brought back their policies. Mr. Kurtz will explain why, if the court were to reach the merits, it should conclude that Purdue does not disturb this full satisfaction plan and why the insurers' arguments seeking to alter the terms of the plan now are meritless. Ms. Quinn will address any remaining insurance-related issues. And Mr. Smola will conclude this morning by describing the extraordinary reliance interests of thousands of survivors who have participated in an agonizing claims process based on the promise of this plan's confirmation. I'd especially appreciate everyone reminding us of their particular topic when you come up to address the court. I'm sure they will, Your Honor. As mentioned, I'm going to be addressing equitable mootness and statutory mootness. This court's equitable mootness jurisprudence first looks to the specific relief that's being proposed by the appellants, whether it can be entered without fatally scrambling the plan and disturbing third-party reliance interests. For the claimant appellants, I think you've heard already this morning that they're asking you to do one of two things. They either want you to throw out the plan entirely and force BSA to start back at the beginning, which is contrary to this court's precedent in all of its equitable mootness cases and clearly contrary to Section 363M, most notably under energy futures. Or else the appellants want you to just sort of give them a carve-out. They want you to give them more money or special rights to proceed that are better and more favorable than every other similarly situated survivor claimant. That relief is obviously foreclosed by the code's equal treatment principle. Let's go back to throwing out the plan. If the plan was not within the bankruptcy court's power to approve and it doesn't meet our criteria for equitable mootness, then it can be thrown out, right? You're saying this would be contrary to our precedent, but that's making a lot of assumptions about whether those criteria are satisfied. My point, Your Honor, is that I think the criteria are satisfied because the core inquiry that equitable mootness looks to is, is there a means of relief that can be provided at this late stage, 18 months after Boy Scouts emerged from bankruptcy and have been in operation, with all of the thousands of transactions that have occurred under this plan? Is there a relief that can be equitably entered at this stage? And I think our core point is that this court's cases teach that the answer is no. What if we have a situation where there's 91% of the funding that is sitting in escrow? It hasn't been distributed. It doesn't have to be clawed back. It's a small portion that would need to be clawed back if that were even necessary. So this isn't, and it's not even in the hands of the trustee. It's sitting in escrow. So what analog can we look to in case law for that? Sure, Your Honor. So on the specific point of the escrow, I think this court dealt with that in the Osram-Sylvania case, and it said that the fact that funds are transferred pursuant to the plan and placed in escrow is no barrier to a finding of equitable mootness because title has transferred. Now, the court's precedents say that the substantial consummation statutory standard in 1101 is not exactly equivalent to what this court looks to for equitable mootness, but obviously it's a useful starting point. The first prong of the statutory test is have the assets, substantially all of the assets, been transferred? The assets of the debtor are the insurance policies. We have sold them. There's no dispute among any of the parties that those assets have been transferred. You can see this in the plan at Appendix 975. The plan is quite clear that the policies, the assets of the debtor, have been transferred. Now, the consideration for that, some of it has gone to the trust, some of it is in escrow, but again, I think Osram dealt with a situation very much like that where you had a partial payment. The other thing to note, I think, is the third prong of the statutory substantial consummation standard looks to whether distributions have commenced. So I think the code itself recognizes that distributions do not need to be complete in order for a plan to be substantially consummated. Does it matter what the percentage is? Here it's less than 10%, at least of the numbers that we have for mid-October, that has been distributed. I don't think it doesn't matter. It's not a question of volume by relation, Your Honor. I think it's a question of how many transactions have occurred. You're talking about 10,000 survivors who have received a total of $40 million at this point. 10,000 transactions. That, by the way, is just with respect to survivors. There's also hundreds, thousands of other transactions that have been completed pursuant to the plan that I think affect this court's equitable mootness jurisprudence. Most notably, the lenders to BSA have refinanced $260 million in debt. BSA is performing on that policy. That type of new loans that have gone to the reorganized entity by a third party, the lenders, is exactly the kind of factors that this court looked to to apply equitable mootness in Millennium and in Tribune. I understand your interest in not unwinding the plan, but if we were to find it unpalatable to take equitable mootness to new heights by saying, in this situation where we've got the funds that are just being held in limbo and would be reverting back if we were not to affirm, and the small percentage that has actually been distributed relative to the size of the trust that's intended here, does statutory mootness provide you with the same remedy in a way that would be much narrower? Statutory mootness certainly precludes the appellant's requested remedy. So the answer is yes. The court can dismiss the appeals. It can reject the relief requested by the appellants on the basis of statutory mootness. I do want to just take a moment, if I might, to sort of respectfully disagree with the suggestion that this would be taking equitable mootness to new heights. I've read every equitable mootness decision that this court has issued since Continental. I think this is the single strongest case for equitable mootness that has ever been presented to the court because we are so far out of bankruptcy. The time alone, 18 months, the thousands of transactions, it's not just about the money that's sitting in escrow. Thousands of donors have given money, more than $86 million since confirmation. They've relied on the idea of their contributions being used for the reorganized scouting program. You have local councils that have contributed more than 100 real properties, dozens of which have already been sold. Those are sales to people who are entirely absent, entirely strangers to the plant. There is no way for those properties to come back. Can I ask you a question? I asked one of your colleagues, what would it look like? Paint a picture. I mean, we talk about returning funds or something like that, but paint a picture for me of what would happen if we reversed the confirmation order. Judge Rundell. What's the practical effect of, you know, we're talking about unscrambling the eggs or whatever. Is that what we would try to be doing? Paint me a picture. Judge Rundell, this is not an attempt to evade your question. I sincerely don't know. There's no precedent for attempting to unwind a plan of this magnitude, of this complexity, a case that the lower courts call extraordinary by any measure. I don't know how we could do it. I don't know what instructions this court could provide to a bankruptcy court, to a district court to sort through that. The idea that it's as simple as taking funds out of escrow is just, with respect, not correct. You have thousands of transactions from people who have no relationship with the plant. Again, the camp properties cannot be unsold. The donations that were received, you know, cannot be just given back. By the way, just with respect to the money that's in escrow, I don't know what you'd be doing with that specifically. Because the plan is clear that the insurance policies have been sold, what you'd be launching is an enormous dispute about what happens to the value of the funds that are in escrow. There's the same consequence if we were to look at this as a matter of statutory movement. Yes, there is. And so between the two, is there a reason that we shouldn't go with? If we think that the criteria are satisfied, we assume with both that we shouldn't look first to Congress's bounding of the court's jurisdiction before a court-made doctrine about when we opt not to reach the merits of a claim. I certainly understand the question. I emphatically agree with you that Section 363M precludes this relief, and I'm happy to talk about that in detail. I think there is one good reason why it would be important for the court to rule on equitable mootness. Indeed, actually, I think what the court should say is that both Section 363M and the equitable doctrine of equitable mootness preclude the appellant's requested relief. And the reason why I think you should do that in this case is the human element. That's what's so unique. I think that's what makes this case so extraordinarily compelling as a matter of equitable mootness. You have thousands of survivors who, as I mentioned at the outset, have relied on the promise of this plan, and they have subjected themselves to an agonizing claims process, an 81-page questionnaire. They've sat for depositions that lasted hours. In some cases, they had to tell family members for the first times in their lives about their abuse, the most awful event that they've experienced in their lives, in order to get verification of their participation in scouting. That retraumatization cannot go unnoticed. Let me ask you a question about the statute for a moot dispute. That has to do with the, I mean, assuming that we would not find that 363 was more restrictive and it would apply to a sale within this plan, but then that is only that little sale aspect. 363 would bar that piece of the plan. The plan is not, the whole plan is not a sale. There's a lot of pieces. How does statutory mootness not get you? It's very messy. How do you say, oh, okay, this is an appeal from the sale, but the plan is much more than the sale. So I don't know how you could craft an opinion that would say 363 means we can't touch anything under this confirmation order because the only piece that we couldn't touch would be the sale piece. How does statutory mootness help you? Certainly, Judge Rondeau. I think the answer is that you look at the relief that the claimant appellants are here asking the court to issue. Our point is Section 363M is dispositive of that because all of the relief that they are seeking would require invalidating the sale of the insurance policy. That's what they want to do. They either want the releases that are integral to the sale to be entirely eliminated or they want you to sort of carve them out from the releases so that they can continue to pursue the insurers, notwithstanding the fact that the insurers sold back their policies free and clear of all claims. You're absolutely right that the plan is much broader than just the sale, but as it comes to the court, what the appellants are here trying to do is invalidate the sale. We know that's true because the case is almost on all fours with energy futures. Now, my friends have been here at the podium saying it matters that the sale occurred in the context of a plan, not separately. Energy futures dealt with that. It's also waived, by the way. There was no argument presented to the district court when the plan documents that went in said, this is going to be a sale pursuant to Section 363M, and then just for good measure, Article 5S4 says the plan shall constitute a motion to approve the sale under Section 363. There was no objection raised by the claimants that this was an improper use of Section 363, even if you thought it was notwithstanding energy futures, which I really think is controlling on this point. But even if, setting that case aside, you were prepared to say Section 363 only applies outside the context of a plan, well, we made a motion to treat this as a sale under Section 363. We know that the bankruptcy court granted that motion. Well, of course you want to do that, so it's insulated from review. But this isn't your classic 363, the classic situation that 363 addressed. 363 is intended to allow debtors to sell property at their highest value without the purchasers fearing litigation that would cause them to want to give a lesser cost. This is an insurance buyback. This is not a sale to – this is not Boeing deciding to sell its assets to Lockheed Martin. This is kind of inside the lodge, calling it a sale, and it really isn't. So, Your Honor, I respectfully disagree, again, because the plan says that this is a sale pursuant to Section 363M. And what was literally sold were the insurance policies. The debtor obviously had title to those policies. We sold them back for consideration. We did so to maximize the value of the estate's property. And in order to maximize that value, the plan documents really couldn't be more clear that these policies were sold free and clear of any claims. That's what enabled the plan to extract that value from the policies for the benefit of the survivor claims. So, I think, again, Energy Future says – I really just couldn't say it better than they do. Allowing these new claims by the appellants, what they want you to do in this appeal, the relief that they are here asking for, is to recognize a right for them to increase the insurer's purchase price by exposing them to new liability that they did not bargain for. They bargained for a complete and total release. The appellants want you to hold that they have something less. So, in Purdue, they should have – the Sackler should have purchased back the fraudulent conveyance claims that the trustee would have had in return for releases and called it a 363 sale. Well, I don't think Section 363 – There's a lot of mischief in this. Respectfully, I don't think so at all, Your Honor. I think that this is standard bankruptcy practice. You're selling back the value of your asset in order to maximize it for the benefit of claimants. The other thing to note about Purdue, of course, is that the Purdue plan was stayed by the Supreme Court before it ever took effect, and, of course, that's the key condition that Congress wrote into Section 363-F. So, insofar as Your Honor is concerned about mischief, I think Purdue provides an example of a situation where that would be avoided because of the stay. Very different than here. Of course, exactly the opposite. The appellants repeatedly requested a stay from this court, from the district court, from the Supreme Court of the United States. They did so before Purdue. They did so after Purdue. They asked repeatedly. They said, we need you to grant a stay because, if you don't, the case is going to become even more equitably moot, and every court to consider that request projected it. Which principle would you prefer if we were to have both options here, and if we reach one, we don't need to reach the other? Which one do you seek as the more applicable, appropriate from your standpoint? You've litigated these cases. Well, Judge Renda, I think the truthful answer is that we firmly think both apply. I would very much like the court's opinion to say that both doctrines, both the statute and the doctrine, foreclosed the request that appellants, but taking your honest question, if I had to choose, I appreciate the point that Section 363M is in the text of the code, and I can see how that makes it sort of easier. And it's less discretionary. Congress has written the specific instructions. It provides us everything that we need. The combination of the text of the code in 363M and energy futures is really sufficient, I think, to reject the appellant's request to change the terms of that insurance policy sale in a way that would materially affect its purchase price. What about the textual argument that your colleague notes about Sections B and C, Sections L and O of 363? Sure, Your Honor. So, again, I think that the plan deals with this by recognizing that this is a sale pursuant to Section 363M. That's built into how it was presented to the court. It's also, again, we submitted it, the plan contains a term that says, if necessary, we are making a motion to sell this property under Section 363M, and that motion was granted by implication of the confirmation. So I think that the conditions to Section 363M have been satisfied here for the same reason why they were satisfied in energy futures. May I take just a moment and talk about the certain insurers appeal? We've been talking mostly about the appellant's claims and why they're foreclosed. When it comes to the certain insurers, and I think Judge Krauss, to return to an earlier question that you asked, this is another reason why equitable mootness is particularly relevant here, because that's the doctrine that forecloses those insurance claims. You heard Mr. Dow say this morning that the certain insurers are here trying to gain an advantage in ongoing coverage litigation. They wouldn't be here investing so much if they didn't think that what they're asking for is material to that. I think the court should be very wary about changing the terms of what was bargained for in intense bargaining in the bankruptcy court, confirmed, affirmed by the district court, so long, so many months after the fact, with implications for another ongoing lawsuit. The trustee has to be cognizant of the value of the assets of the trust. So I think that they want you to believe that it's just so simple as blue penciling a few lines in the plan. I think this court has repeatedly said this is a closely integrated transaction, as the district court found. We're not going to, after the fact, disturb it in a way that raises difficult questions about what is the value of one of the trust's most important assets, more than $4 billion in insurance rights. Next question. Would you say that they're adequately protected by the language of the plan? They're saying their rights are going to be constrained because there's reference to confirmation. What would be wrong with using the language they proposed from other cases that says, notwithstanding the plan, all of our rights and obligations are preserved? I think some of my colleagues would be better positioned to discuss with you why that argument is incorrect on the law. I think what I would say from the standpoint of mootness is that this is the plan that went to the survivors to vote on and overwhelmingly approved it. And it was presented to the survivor community as a global resolution. What they're seeking to do now, they clearly believe that this is a material change that they're asking you to make. And so I think it is contrary to the equitable principles that underlie equitable mootness to say, 18 months after confirmation, with ongoing coverage litigation happening in a different court, we are going to change the terms of the deal. And, again, my colleagues, I think, can speak to why that's inappropriate as a matter of bankruptcy law. And they leveled this objection at the time of the plan confirmation, I assume. I'm sorry, who did, Your Honor? The certain insurers. So, again, I think I'm going to leave that, if I might, to my colleagues who are better positioned to speak to that issue more directly. Again, I think the key point is they want you to think that it's simple. They are seeking to change the terms of the bargain in a way that they certainly believe is material. Thank you. Thank you. May it please the court, Philip Anker for the Hartford insurers. I was about to say good morning, but I think good afternoon would be the rather more accurate way to put it. Judge Krause, I want to start where you were. I think it is appropriate to begin this analysis, and I think you can finish the analysis, with statutory mootness. I think the fact that this case is being argued against the backdrop of Purdue underscores the appropriateness of that. After all, Purdue is a plain-meaning decision. Justice Gorsuch, writing for the majority, said, I may agree as a policy matter. I don't want to be quite put it that way. He said, I may agree or disagree as a policy matter with the arguments made in Justice Kavanaugh's dissent, but those are policy considerations for Congress. My job, our job as the Supreme Court, and respectfully, your job as a panel, is to take the statute as it is. Here you have a statute that is clear in creating mootness, and I acknowledge mootness here is not jurisdictional. It goes to whether the relief can be granted, and the answer to the question is no effective relief can be granted. 363M, even if it would otherwise apply, is it really appropriate for a situation where the lack of authorization by the bankruptcy court goes to something as fundamental as its lack of power, lack of authority at all, to rely on these non-consensual third-party releases? In a word, yes. If statutes of mootness, statutes creating mootness, if statutes of limitation are going to have any meaning, they have to have meaning. The only place where they do work is if the argument is otherwise substantial, and Judge Krause, I would point you to your own decision as the author in the Energy Futures Holdings case. The principal argument made there was denial of due process. If anything is more fundamental than denial of due process, I'm at a loss to know what it was. You said, the panel said, there is no exception to 363M for due process. So too here. There is no exception. Isn't that a distinction between the merits of a claim and the authority of the bankruptcy court itself? What if we were looking at Northern Pipeline? What if the question were whether 363M would come into play and preclude review where the bankruptcy system itself had been? So I think there's a distinction, Judge Krause, between whether there's a lack of jurisdiction, which goes to the court's power to decide a question, and I plainly say there was jurisdiction here both related to and core, if you want me to go into it, versus whether the statute gives authority for the plan to provide that. That is a merits question. It goes to statutory authorization, not to jurisdiction. And so, yes, if there's a lack of jurisdiction, I think you may want to pause, but there was jurisdiction here under Title 28, Section 1334 of the Bankruptcy Code. That's the distinction. Let me try to address quickly the two arguments I've heard on why 363M does not apply by its terms. One is this notion that it was done pursuant to a plan. First, I want to underscore the point that Mr. Houston made. The plan said, and I quote, that it, quote, constitutes a motion by the debtors for the bankruptcy court to approve the proposed compromise and settlements and assignment and or sale of the applicable insurance policies pursuant to Section 363. The order said the same thing. So you have here express authority in the plan, and absolutely it was waived. There was no argument made below to Judge Silverstein, this can't be happened. And think about how, if I can use the term, silly that would be. You're really going to say we need to have two separate documents, a plan and a motion, and they each can be contingent on each other. We have to kill more trees, we have to file more paper. Why? It's simply putting it in one piece of paper. So on the merits, the argument fails, and it's waived. The second argument I've heard is that, well, money was put in escrow. That is right, but the focus is on the wrong question. The question is when were the policies sold? And, again, the plan couldn't have been clearer, and the confirmation order. The plan said, notwithstanding anything of the contrary and for the avoidance of the doubts, the abuse insurance policies shall be sold by the debtors to the applicable insurance companies, free and clear of all liens, claims, encumbrances, interests, or other rights, on the effective date. And so, too, did the confirmation order. So there the plan was crystal clear. These policies have been sold. And I see my light is on, but if I could have a moment. Can you address, too, going back to one of my earlier questions, the status of the assignments? The status of the assignments? The assignments all occurred on the effective date as well. The plan is quite clear in saying that the participating charitable organizations assigned their rights on the effective date to the trust vis-a-vis the non-asset, versus vis-a-vis the set of insurers so that those claims could be settled. That occurred as well on the effective date. So, Judge Rundell, let me get to your question, which is a couple of questions, if I have a minute. One of which is, what are the consequences? And is really this a sale? Are we allowing the tail to wag the dog? Respectfully, we are not. I would acknowledge there could be a plan in which the sale is a little footnote of a total plan. Here it was the guts of the plan. It was the core of the plan. Two billion three in funding, a billion six is coming out of the sale of the policies. But don't take my word on it. Take what Judge Silverstein found. She found that without the sales, quote, there is no plan, end quote. She went on to find, quote, without the scouting-related releases in favor of the settling insurers, the non-debtor-related entities, local council, chartered organization, their representatives, the settling insurers and local councils would not make their monetary contributions to the settlement trust, and thus, quote, the scouting-related releases and challenge junctions are the cornerstone of the plan. Those are findings of fact that not only are not clearly erroneous, but are supported by every shred of evidence. The Dumas claimants and the Lujan claimants called exactly zero witnesses at trial. Zero witnesses. Every witness so testified. But I just see a problem with removing a plan of this magnitude, which does so much. Sure, the sale is a but for, but it's a plan that's been confirmed, and a huge, absolutely huge one with huge impact, a lot of people being affected by it. It's removing it entirely from this court's capacity to look at it, to look at it. And what if it were fundamentally unfair? What if, as a part of the sale, things, you know, there are provisions here saying, you know, insurance companies have no rights, et cetera, et cetera. The fact that it is a sale, I think, pales in significance to the fact that this is a confirmed plan. And at least under the doctrine of equitable mootness, we have the ability to say, we're going to find it equitably moot, or, on the other hand, we're going to look at it and see there are some glaring problems with this, and we're going to find it's not equitably moot. I mean, it's in our discretion whether to apply equitable mootness. We don't have to apply it, and we can have the ability if this plan were fundamentally unfair. And I can't blame the bankruptcy court for saying, you know, it's 363M. If I were a bankruptcy court, I wouldn't want to do over either. But I just think taking the plan out of the capacity of an Article III court, something this big, and say, oops, you know, Congress intended that we don't touch it. And I think Congress intended when there is a sale of assets that is strictly a sale of assets, we don't touch it. But when it's a plan, I can't imagine that Congress would say if there's a sale that's a part of a plan, we can't review the confirmation order, which is what we have. We have a confirmation order that is on appeal. And the fact that there's a sale that is a buck four, I have real problems with saying Congress intended that no Article III court can look at a plan that contains a sale. I just have a real problem with that as a jurisdictional piece and as a matter of law and what we do. Article III courts are supposed to review. Sure. Let me try to respond and try to persuade you. First, an Article III court did review. The plan did not go effective. It was written so it could not go effective until the district court issued its order, Judge Andrews and the district court, obviously an Article III court. Second, 363M doesn't apply if there is a stay. There was an opportunity, and, indeed, the claimants here sought a stay. And so this panel ---- One of the reasons there wasn't a stay is because this is such a big deal. It also ---- Judge, let me tell you the different reason, which is something you pointed out earlier, timing. When the question of the stay came before the motions panel that considered it, the Supreme Court had not decided Purdue. And the law of this circuit was that third-party releases were perfectly lawful. I would suggest to you the case here, if you find statutory mootness, is a case that will not repeat itself. It will not repeat itself on these facts because now we're in a post-Purdue land. You are going to hear from other appellee counsel that the plan, Mr. Kurtz in particular, would not and does not, is not inconsistent with Purdue because this was a payment in full plan. But let's put that aside. If there was not a payment in full here, this is a different outcome tomorrow. But timing does matter. And so, first, there was an opportunity, and there was an absolute review by a district court, an Article III court. Second, there was an opportunity for a stay. Third, look at the decision, again, of this court in the Energy Futures case. That is a case that applied statutory mootness to a confirmation of a plan order, confirmation order that denied latent asbestos claimants the ability to assert their claims because those claims hadn't arose. So this court's precedent goes there. Finally, Judge Rendell, I would urge this court to look at what it has said in answer to the question, because I think this goes to the question, can effective relief be granted that separates out the sale from the rest of the plan? First, the answer to your question in one word, what would happen if the court were to uphold the sales but otherwise reverse the plan is, I'll give you a one-word answer to that, chaos, utter, complete chaos. Our position, as written in the terms of our underlying agreements, is that we then get back every penny in escrow, but the policies have been sold. The debtor and the claimants are going to have to take a different position from that. So what you're going to have is chaos and years of litigation. And one of the things 363M is designed to do, as this court has repeatedly said, is to create finality. It's designed to do the opposite of create chaos. This court has said that the question, when you ask the question, can I grant the relief, even though you have an unstaged sale order, is whether the relief being sought is, quote, so divorced, so divorced, that comes out of the Energy Futures case and Pursuit Capital, from the sale, whether it involves, quote, only collateral issues not implicating a central or integral element of a sale, comes out of the same two cases. I think, Judge Krauss, in both cases, you, in your opinion, were quoting the panel's prior decision in Pursuit. Here, no credible argument can be made that the third-party releases were divorced from, were collateral. They were the guts of the sale. My client, Mr. Hacker's client, is going to follow me, and the other settling insurers paid $1.6 billion. That is a lot of money, even in the inflationary period we live in today. And that kind of money gets paid when you get complete peace and not under other conditions. So it was integral to the plan, and if you try to separate the two, we're going to be in years of litigation, and, Judge Rendell, I hope we don't get to what you were suggesting, which is a liquidation of Boy Scouts, but we may. That litigation may be litigation in which I'm opposite a Chapter 7 trustee, years from now, fighting over whether we get that money back. That can't be the right outcome. It's not consistent with 363M in its policy in favor of finality. I believe one of your colleagues said a few moments ago that both 363 and equitable mootness should be applied here. If I misheard him. Your Honor, I agree that both can be a bar here, given that equitable mootness is obviously the law of this circuit. Whether someday the Supreme Court will examine the question of whether it is an appropriate doctrine or not is something that may happen, but it is the law of this circuit. And I think that the very same sales that give rise to the statutory mootness argument also give rise to equitable mootness. I'm focusing on statutory mootness in part because we decided to divide up time and attention, and in part because I do think, given the statutory basis, I think it's an easier place to ground a decision here, a safer place, a simpler place, and one, again, that is more faithful to Purdue itself, which, as I began, is a plain-meaning, read-the-words-of-the-statute case at its core.  Can I ask you about the gamesmanship that I mentioned, that hereafter they will frame purchases of releases, if you will, that will frame the use of releases as part of a sale, while selling fortune and conveyance claims is something in return for releases, and escape scrutiny on appeal under 363M. Am I being too – is that out of the realm of possibility? When I'm asked a question, is something out of the realm of possibility, it's hard for me to answer the question, no. Yes, it is completely – I'm a bankruptcy practitioner, and I know – we are creative. We are creative, those of us who practice in bankruptcy court, and I do often. I think you're giving, respectfully, Judge Rendell, too little credit to the bankruptcy court and to the district court when it reviews the decision. Here, because there were third-party releases, no one was comfortable with having this plan go effective before an Article III court got to look at it. Will there ever be an attempt to try to use 363 to insulate an issue? Maybe, but I do practice, and I do have a lot of confidence. Judge Silverstein wrote a 200-page decision, 180-page decision. The amount of time and energy and diligence she spent – this is not a rubber stamp – was extraordinary. The amount of time and energy Judge Andrews spent was extraordinary. I argued in front of him, and I saw his opinion. And then this went up, within it, with a motion for a stay, and I can only presume that the motions panel on this court also exhibited diligence and took its responsibilities seriously. So, Judge Rendell, anything is possible, but do I think we are going to have a series of unlawful plans over and over again? No, I do not think that's the future. Thank you. Thank you. Thank you. Good afternoon, Your Honor. Your Honor, it's John Hacker, Fourth Century, another settling insurer and Gibbs affiliates. I think that the Supreme Court's decision in Perdue and Judge Krause's opinion in Energy Future together established what is an irrefutable case for affirmance under 363. Now, Perdue, we know, doesn't itself address 363M, but it matters because, as you've already heard from my colleagues today, of its rigorous, rigorous emphasis on applying the code's plain text as written. And according to Energy Future, 363's plain text means what it says. When an estate asset has been sold to a good faith purchaser, straight out of the text, and sustaining an objection to the plan would affect the validity of that sale, the objection must be rejected. It's not necessarily a jurisdictional kind of mootness. It's simply a ruling that the objection cannot be sustained because the statute, by its plain terms, prohibits the court from providing that kind of relief. That rule compels affirmance here. As the Bankruptcy Court explicitly found, based on undisputed evidence, this wasn't just an observation, if you look at the court's decision, the insurer's payments were made in exchange for two essential integrated components of consideration. They get their policies back. That's the asset that is transferred, Judge Nadell, there's absolutely a property asset transfer, and they get the releases of all scouting-related abuse claims. If the court were to invalidate the releases, the insurers indisputably would not get what they paid for. The plain text of 363 could not be more directly applicable. Let me just address two points in the time that I have. One, I think, Mr. Anker addressed with you, Judge Rundell, your concern that that's really not what Congress meant by a sale, and Mr. Anker, I think, had some answers to that. I just want to underscore the relevance of Purdue on this. What Purdue tells us, if nothing else, is that we don't read the code and try to think about what Congress might have meant or also could have said, or other caveats it might have written in, or exceptions it could have engrafted onto the plain text. You read the text and you apply it. And 363M says when there's a sale, which there was here, to a good-faith purchaser, which there was here, as was found by the bankruptcy court, then this court can't do anything to affect the validity of that sale. The sale clearly fits within the plain text of the statutes, an asset transferred for an extraordinary amount of value to a good-faith purchaser. And as Mr. Anker emphasized, the code obviously has many protections for the kind of mischief one might worry about. And I would just underscore the point that, at the end of the day, Congress, we know from Purdue, is the source of identifying and channeling and providing for those kinds of protections that did so here if there need to be more. If it turns out there are problems in the future, which I think is clearly there won't be for the reasons Mr. Anker says, that's a problem for Congress to address. That's what Purdue tells us. The other point I want to make is in response to the claimant's argument, a couple of sort of related arguments. First of all, that the sales are only conditional, they didn't even happen. That's just simply not correct. The sales have occurred. Mr. Anker read you the phrase. They have closed. There's nothing left to happen. What's an escrow is not the policies. They set a case from the 8th Circuit, I think, the Olson case where it says property that's an escrow isn't really finally transferred. It's not about the – with respect to the 363 argument, the escrow might be relevant to the equitable mootness issue, but as to 363, what matters is the policies have been, to quote ESA, irrevocably transferred. They've been transferred. The escrow is only about a post-sale, post-closing provision for how the money will ultimately be distributed, just like the Krebs case from this court, where the payment had only been 10% up front and there was going to be a payment down the road. But what mattered is the asset had been transferred, exactly the same. It's true, exactly the same as in your opinion, Judge Rundell, in the Osram-Sylvania case. The other issue I heard the claimants raise is that because of the related point, because of the escrow, and I think Judge Sirica asked about the sort of status of the escrow or why that matters, the releases can be invalidated without affecting the sale of the policies because the policies will be gone, but the money will come back. And so the sale is complete because the policies are still transferred. That's a blinkered view of what the transaction was. I think Mr. Anker read you the key finding, and there's actually a bunch of them sprinkled throughout the bankruptcy court's decision about the multiple components of the sale, the consideration for the sale of the policies wasn't just the money. The money was paid for the transfer of the policies and the releases. You cannot untangle those. If you invalidate the releases, you unambiguously change the core, the integral elements of the sale just as an energy future, just as in pursuit capital, just as in decisions by circuit courts around the country. Because 363M on the merits disables the court from providing that release, it can't provide that release. And because that's the only release they're seeking, to your point, Judge Rundell, about the court needs to be able to review a large plan, that's of course true. And if an appellant in a given case has objections that are aside from, different from, and don't affect the validity of the sale, they can raise those objections. Somebody might complain about the trust distribution procedures. Somebody might complain about the due process, the process as in energy futures. This court didn't say it was unchallengeable in energy future. The court said you couldn't challenge the validity of the sale, but there was something else that the court, relief the court could provide because it wouldn't affect the sale. It's simply not true here with respect to the request by the claimants, the sentencing claimants, to invalidate the releases that not relief the court can provide. And so the objection has to be rejected. And because that's all they argue for, the plan has to be confirmed. No further questions? Thank you. Thank you. Good afternoon, Your Honors. Glenn Kurtz on behalf of the Boy Scouts of America. What I'm going to try to do in my time is first briefly address the insurer's arguments about the assignments of the obligations, correct. One jurisdictional fact that was mentioned today and then spend most of my time addressing why the Purdue decision does not apply to the BSA plan because it provides for payment in full. Judge Rendell correctly identified portions of the record where the insurer's obligations were preserved and assigned. And I will add an additional one, Judge Rendell, which is paragraph 48 of the confirmation order. That is at page 842 of the record. And it provides, quote, nothing in the plan shall modify, amend, supplement, or be interpreted as modifying, amending, or supplementing the terms of any insurance policy or rights or obligations under such insurance policies. And I will note that counsel spoke to modifications relating to the confirmation, I'm sorry, relating to the plan. That's not included in paragraph 48 of the confirmation order. There's no qualification that it's subject to the plan. I will also point out that the confirmation order, including in paragraphs 32 and 33, which is at 827 and 828 of the record, explicitly preserves the insurer's coverage defenses. And both lower courts found that the documents explicitly preserve the insurer's coverage defenses. Now, I want to address the argument that the settlement trustee has taken a different position in coverage litigation. I should start by noting that's not in the record. That's outside the record, nor could allegations or assertions made by an advocate in a case override the governing documents here and the determinations and the findings of the two lower courts. But I also need to point out that the arguments that have been made and the allegations that have been made have been mischaracterized badly by the insurers. So if you do go outside the record, what you will learn is that contrary to the insurer's argument that the settlement trustee argued, that the coverage defenses were considered and rejected by the court. If you look at what they cite to, what the trustee argued was exactly the opposite. What the trustee argued was that the lower courts, quote, rejected the insurer's argument that the plan unlawfully impaired their rights under the insurance policies and then confirmed the plan over the insurer's objections. And that is exactly our point here, that there has not been an impairment on the plan. There's been a preservation of those obligations. And in fact, also inconsistently in that same case, what the insurers say is that there is protective language that was entered by the court that's included in the TDP and that, quote, is the position here and the exact opposite of the position they're taking before this court. The other allegation that comes out of the coverage litigation is that, quote, the trustee argued that the insurer's, quote, must provide coverage for the abuse claims without regard to the underlying obligations and defense of the insurer's policies. That too is included nowhere in the coverage complaint. If you look at the cited language, what it says is there is an actual controversy for purposes of the declaratory judgment because the trustee believes that the insurers have to provide coverage and the insurers disagree with that, which is a dispute that goes back long before the bankruptcy case. As to the changes that have been proposed, the only effect of the language that's included in the TDP about subjecting the obligations to the confirmation order are that the confirmation order provides for an assignment, which is not permitted under the insurance policy, but is permitted as a matter of bankruptcy law. That's why that's there. In terms of res judicata, the insurers argued that the court made some sort of coverage ruling. I don't know you could find anything that could be further from the truth. The court repeatedly not only preserved the insurance defenses, the coverage defenses, but argued that they were not justiciable and they would be decided if there is a dispute in the future by a coverage court in the future. Then finally, the idea that there will be no impact to the insurers, no adverse impact, I don't know what that means. It's too vague for inclusion. What was really suggested was that the court imposed a provision that the awards and the decision by the settlement trustee would be inadmissible in hypothetical future litigation. Any evidentiary rulings that need to be made in future hypothetical litigation should be made by a future coverage court if there ever is such a case. It's not justiciable at this point. Frankly, I don't think it's a correct ruling anyway. I don't know how a decision by a trustee, which would presumably be the basis for seeking indemnification, wouldn't be admissible. Wouldn't be binding, but it would certainly seem to me to be admissible. That's for another day. On the jurisdictional fact, counsel argued, I think in response to the notion that there is shared insurance, which would be sufficient to support the exercise of jurisdiction, that there is not shared insurance pre-1976. I want to correct that in three ways. One, there is contractual indemnity obligations by BSA, so they have that affinity of interest. Two, there is, in pre-1976 policies, there is coverage for contractual obligations, so there is shared insurance for that reason as well. And then third, and Your Honor had asked about this, Judge Krause, they've also assigned policies, the pre-1976 policies, which then become, of course, property, the estate. The response was, no, that didn't happen. It did happen. The settlement trust assets, which is defined at 909 of the record, includes the pre-1976 policies by the local councils and the charter organizations, and those were transferred as of the effective date, and that is at page 931 of the record. With that, I do want to turn to the primary purpose for me here today, which is to address that Purdue does not apply to the BSA plan, not only because it's been substantially consummated, but also because it provides for payment in full. And I start, of course, by pointing out that BSA submitted an amicus brief in the Purdue appeal explicitly, arguing that any non-consensual third-party releases, limitation that might be imposed by that court should not apply if a plan provides for payment in full, and the court's reaction to that was to carve out from its decision, among other things, plans that provide for payment in full. Lisa, for another... What is the total... Go ahead, Judge Truendo. What is the total amount of claims that will be involved in this case? So, Your Honor, the proof of claims that were filed at the time of the bankruptcy was approximately $82,500. However, the claims that have been pursued timely, including with respect to extensions, is approximately $60,000. So, I mean the total dollar amount that's going to be distributed under this plan. The dollar amount is going to be the $2.64 billion, the $200 million contingent funding, and between $4.2 and $4.4 billion of value associated with the unsettled insurance policies. How do we know the total amount of claims? We don't have a final... I don't mean claims. Total amount of money that's going to be distributed to claimants in this case. We do not know that, do we? Your Honor, we can't possibly know, and in no case, this case included, can one know with absolute certainty, and that's not required under the bankruptcy code or otherwise, precisely what everyone will get. However, there was... For you to say it's a full satisfaction plan, you need to know that there is the money available to pay all of the claims that will be filed, and we can't tell that here, can we? No, I think you can, Your Honor. I'll just... Before I point to the evidence, I would note that it is, of course, routine in bankruptcy cases to have ongoing obligations without a guarantee they'll be paid, but based on estimations, based on the evidence by a court, that they're adequate for purposes of full payment, including the reinstatement of debt. That doesn't mean that all that debt will be paid over the 10 years it might be reinstated, but the estimation is binding and adequate. Here, we had a very robust record on payment in full. We had experts, three different experts testified. I will note they're the only experts on the subject. They're not only solid evidence. They're the only evidence. We had the testimony of Dr. Bates, a leading economist, who has been certified in other cases. He's valued claims thousands of times. He valued these claims off of the databases available. He pulled together trust distribution procedures designed to replicate historical resolutions within the tort system. He applied a frequency severity approach, which is a recognized approach in the scientific community, and no one disputed that. He was able to determine, based on claim characteristics, including the nature of the abuse, the frequency of the abuse, the profile of the abuser, potentially applicable statute of limitations, age of the survivor, and a host of other matters, that the overall range was going to be between $2.4 and $3.6 billion. Ms. Gutzler, who is an expert in mapping insurance values to claims, was able to conclude, again, certified as an expert, extremely experienced, has done this thousands of times, was able to conclude that the value of the unsettled insurance was between $4.2 and $4.4 billion, resulting in trust assets that provide almost twice the amount at the high end of the expected range. None of this was disputed. The court, Dr. Bates, for example, was on the stand for eight hours. The court found that he was credible, he was thorough, he was methodical, and made the same findings with respect to Ms. Gutzler as well. I will also point out, Your Honor, that the same circumstances have come up in the first case and the only case, I think, that have addressed the Purdue full payment plan issue since it was issued, which is the Byrd Global case in the Southern District of Florida. The court in that case likewise reviewed expert testimony, valuing claims, valuing trust assets, and projecting that there would be sufficient assets to satisfy claims in full, and found that under Purdue that was permissible over the objections of non-consenting claimants. Why should it be permissible when we look at the reasoning of the court? I mean, the court, of course, it did curve it out. But if we're looking to its rationale, why should it matter whether there's full payment or not if there was no authority on the part of the bankruptcy court to do this? So, Your Honor, I think there was authority. Let me start with the authority and then move to the one satisfaction rule. But let me start with the authority because you are correct that the Purdue court spoke in terms of a lack of statutory authority. That's because in Purdue, the debtor had cited 1123B6. And the court concluded that the assets at issue that were being addressed, which was the Sackler contribution, didn't fall with any of the statutory provisions because it was non-debtor property. And it was being contributed in exchange for a release from a non-debtor. And what the court said on page 2082 is that the statute, quote, permits the plan to address claims and property belonging to the debtor or the estate. In this case, we are addressing property that belongs to the debtor or the estate. It's their insurance assets. And there is statutory authority in a number of places. And I start with 1123A5D, which authorizes the debtor to sell any of its property, which includes insurance assets. I also look to 363B and F, which authorizes the debtor to sell its property free and clear of liens. I look at 1123B3A, which authorizes the debtor to settle its interests in any property. And I look to section 1123A5, which specifies that, quote, notwithstanding any otherwise applicable non-bankruptcy law, so we're talking about a senior provision here, a plan shall provide adequate means for the plan's implementation. And in order for the BSA to exercise its statutory authority to monetize its assets, to sell its insurance, to settle its interests, which were disputed by the insurer. We generated $1.6 billion of value on disputed insurance. By definition, the BSA had to provide releases because you needed the participation of the other insurers, people who also had an interest in those policies. And the record is, and it can't be disputed, because this is uniform practice, that none of those co-insurers would agree to waive their rights to the insurance policy covering them if the claims that were being so covered by the policy were not released against them as well. It is important to note here that the primary assets for this estate are the insurance assets, and if you don't have the right to exercise your statutory authority to sell your assets, to monetize your insurance, through all the attendant rights you would need, including the ability to get the participation of other joint owners in effect, then you can't exercise that, you can't reorganize. If the debtor has an obligation to maximize the value of its estate, to provide compensation to creditors, the only way to do it in circumstances like this where your primary asset is insurance is to get the participation of the other insurers. Now, I'm sure you will hear that the statutory authority that I'm citing, and by the way, also cited and relied on in the Byrd Global case, doesn't explicitly speak to releases, but I will also say that as far as I can tell, and I've looked at it hard, there's not a single provision in the bankruptcy code that authorizes or specifically speaks to releases, consensual or non-consensual, and I think everybody would be compelled to agree that consensual releases cannot possibly be an issue, notwithstanding the fact of some specific provision set forth in a bankruptcy code because there is no bankruptcy case that doesn't have disputes that need to be settled and that settlement doesn't have to include releases. And by the way, I should probably also add, as one of the authorities, and it was in Byrd Global, is Rule 9019 as well. Your Honor, the other authority-related issue here is the One Satisfaction Rule, and it at bare minimum really sheds a lot of light on the equities here because the One Satisfaction Rule provides that so long as a defendant provides satisfaction, full satisfaction to a claimant for a single indivisible injury that the claimant loses by operation of law the ability to sue other defendants that could have liability. Those claims are released and they're barred. They are barred from pursuing those claims. This is a settlement in full plan. So that is another authority. There was no common law authority that was raised in Purdue, and this one really means it's sort of at a bare minimum, no harm, no foul. You're looking at compromising the ability of a debtor to reorganize. And we're talking about a 120-year-old, congressionally chartered, not-for-profit that is built into the fabric of this country dedicated to the training of youth for the betterment of society. And you're talking about 60,000-plus survivors that have been waiting sometimes, according to the record, 50 years for compensation that are literally dying as we're getting through this case. And to compromise this plan because the claims will be paid expeditiously, a lot more expeditiously than in the tort system, but haven't been paid yet, I submit, doesn't make any sense. Thank you. Other questions? Ms. Rendell? No. Thank you very much, Robert. Thank you. Good afternoon. May it please the Court, Kami Quinn here on behalf of the plan supporters, specifically Insurance Coverage Council to the FCR. And my role here is to address some of the insurance merits issues. In particular, I'm going to very briefly, so as not to repeat any of the things that Mr. Kurtz just raised, talk a little bit about the insurer's carve-out request and then go to the judgment reduction provision. Okay. On the carve-out, and this, I think, going back to something that you raised with respect to this argument before, there are certain background principles of law here that none of us disagree with, which is that the insurer's contract rights can't be expanded or contracted with bankruptcy. And indeed, as Mr. Kurtz read, that's expressed in the documents. That's laid out. But what the insurers are asking for, although they characterize it as something small, is something more than just a preservation of their rights. The actual language that they're asking for you to put in says that they are exempt from collateral and estoppel race judicata in any respect, not just with respect to some certain findings. They also, the language suggests, that the facts of awards by the trust could not be used in evidence in a coverage action. None of this is just a preservation of contract rights. What they're asking for is not just to preserve their rights, but they're asking to preserve pre-petition circumstances, and they're just not entitled to that. In contrast, all we're saying is that the coverage court can apply the unchanged defenses of the policies to the actual facts and circumstances, which are that there is a confirmed plan and that the insurers litigated certain things in that plan in connection with that plan and not others, and that the confirmation order applies to them as it would apply to anyone else. And I think that that's a fairly uncontroversial position, and that adding the language of the insurers, that the insurer's request would be giving them far more than just a preservation of their contract rights. So is there... If you agree that there's not impairment and that it's really these background principles that are coming into play, I gather there wouldn't be an objection then to... even if the plan were not amended, to this court clarifying what those principles are. Sure. I mean, we would agree. I mean, I think the district court did. I think the district court's decision said a number of things about the fact that defenses are not impaired. I think that language is already in the TDP. What we're saying would be problematic would be saying that somehow things like orders of the court don't apply to them, that res judicata doesn't apply to them, that they are somehow entitled to pre-petition circumstances rather than just pre-petition contracts. Their contracts apply, but they apply to a world in which the bankruptcy case occurred and the judgments are in rulings. And the coverage court can apply those rulings in context with the contracts that the insurers wrote. I'm already getting close to the end of my time, but I'm going to go to judgment reduction pretty quickly, and I'm happy to answer any questions you all have on that as well. On the judgment reduction point, the alliance insurers asked the court to rewrite the judgment reduction provisions, which were part of the integrated whole of the deal that was struck here that ultimately got overwhelming support of the creditors. One of the pieces of the deal here, and one of the reasons why this is important, is the creditors were voting on a trust that paid survivors, not one where insurers would be able to come back and invade the corpus of that trust. Doing so would have a real material effect on the trust. It would increase litigation. It would require the trust to consider that in her coverage litigation sphere, and it would create a situation which would make it difficult, as the district court found, that she might have to project those claims, take into account those claims in paying insurers. This violates Purdue, though. You're saying they don't have a claim, which they rightly have. It's discharging a potential claim of theirs. I have to say, because it's Purdue, is it not? I think what the analysis that the district court did was basically a 363 Adequate Protection Analysis. I don't know that Purdue eliminates that. While it didn't actually say that, we're talking about it's a claim against the settling insurers, that is the contribution claim here, and that's the asset that's sold. Essentially, insurers are asking for protection for their contribution interest in that settled coverage, and the district court found that they were adequately protected for that interest. Doesn't it say they can't go against the trust for this amount that they're owed? It does, but the court found that they're adequately protected because they get paid in other ways, which is the reduction of overall defense costs through the trust procedures, which massively reduces their overall defense costs. What's that finding based on? There's no hearing on that point? You're right, and the reason for that is because the Allianz insurers didn't raise this objection at all in any of its briefing at the bankruptcy court level. They proposed language that did this, but never actually requested this relief until oral argument on the form of the confirmation order. Ultimately, what the bankruptcy court did is she took two proposed orders under advisement and chose one. She did not make findings on this, and that's true, but the reason for that was Allianz's failure to raise it in 29 days of trial or any of the confirmation briefing. But they proposed language. They did, but they never tried to justify it, and so the court simply did not. The language that the VSA had proposed originally. No, this language is different. The judgment reduction language is not language that the VSA originally proposed. This is language that was exclusively proposed by the insurers in an exhibit to an objection to the form of a confirmation order. So if we think there is a Purdue problem here, but it's not apparent that it's in reality anything but speculative, wouldn't the right course be to remand for fact-finding on that point? I mean, it may be. It may be. I think the fact that the trust procedures will massively reduce defense costs, I think there is ample record support for that, including a variety of the purposes that the bankruptcy court found. I think she said a number of things in the intent of the process being an efficient method of payment for survivors. There's a variety of facts about the purpose of the trust being to streamline processes and the like. So I think that this court could take a look at the fact findings she did make, although they were not made in connection with this argument, and find ample support for the fact that the trust procedures will significantly reduce overall defense costs. Thank you. Good afternoon. May it please the court, Evan Smola on behalf of some Amici survivors. I'm here to give the court some perspective from the vast majority, indeed the overwhelming majority of survivors that support this plan. Survivors have relied upon the order of the bankruptcy court, the affirmance of the district court, and the ongoing administration by our trustee. Judge Krause, earlier you were concerned with bringing equitable mootness to New Heights, and I want to touch upon exactly why this is an extraordinary case that does not do that. After the effective date and during the 18-month implementation of the plan, the processes outlined within the plan inflicted real human costs upon survivors. Those are sunk costs. They cannot be unwound. They cannot be refunded or remedied. To start, survivors answered an 81-page questionnaire. It asked that survivors focus on their abuse, think about it, relive it. It asked questions like, were you penetrated? And if so, how many times, when, and where? The plan asked that survivors demonstrate that they actually participated in scouting through extrinsic evidence. Survivors scoured basements and attics and garages to find their old scouting memorabilia to prove they had a claim. When they couldn't do that, the trustee asked that they prove it through a third-party affidavit, a friend or a family member. This required survivors to disclose their abuse, a secret hidden for years to friends or family, in order to explain why they needed such an affidavit. Survivors with health problems over the last 18 months have hired probate attorneys to ensure that their claims could be advanced by their family and that their family could recover. Once again, this required they disclose their abuse to their family. Sadly, our firm represents about 5% of the total population of survivors. We have had 250 of those individuals pass away in the last four years. Many of them specifically instructed us not to tell their families about their claim. So when they died, their claim died too. Independent review claimants, it's akin to a binding arbitration. Those claimants have subjected themselves to six-hour depositions and eight-hour arbitration hearings. They've relived their abuse, heard attorneys talk about their abuse and dissect their abuse. And finally, thousands, indeed more than 10,000 claimants, have finally reached something approximating the end of this ordeal. They've finally received acknowledgement. You were abused in scouting, and we believe you. While the court may be concerned that not a huge, vast amount of money has gone out the door relevant to what is owed, this closure, this acknowledgement that this happened and that our trustee believes them is an enormous step towards closure for childhood sexual abuse victims. Those claimants signed a release. They signed away their rights and reliance upon the plan and in exchange for continuing their claim within the trust. The hard and painful work of childhood sexual abuse survivors is done. The deadline to complete that work passed in July. 57,000 survivors tore away that scar tissue and faced their abuse head-on because that's what the confirmation order required of them. They did so at a terribly steep personal cost, costs for which there are no remedies. A survivor cannot untell a family member that he hid sexual abuse from them for years. A survivor cannot undo the nightmares experienced in the days after going through this questionnaire. A survivor cannot mend their relationship with a family member who no longer speaks to him after disclosing his abuse. And a survivor cannot unwind the damage done to a marriage when disclosing to a spouse a secret hidden for decades. The costs paid by tens of thousands of survivors in reliance on this plan warrants affirmation and dismissal of these appeals. A remand or an unwinding of the plan would devastate the survivor community, 0.02% of objectors notwithstanding. It would deprive hundreds, if not thousands, of survivors from obtaining justice as they will die waiting. Judge Rendell, you asked a number of attorneys, as a practical matter, what would happen if this plan is unwound. In the survivor community, it would be devastation. I urge this court to allow the plan to go forward in its entireties. And if the equities rest with anyone in this case, it is with the survivors that have done everything our justice system has asked of them. Those survivors now see an end in sight, and it is an end they desperately need. Unless you all have any questions, thank you for your time. Thank you, counsel, for your application to appear as an advocate today and to offer this important perspective. The court is certainly aware, and I'll counsel as we talk about these interesting legal issues, that behind them are real people and the horrific experiences that are what brought all of us at the end of the day to court here to discuss these issues are well within the consideration of the court, as well as the need for a timely resolution by this court. Thank you, Judge. Thank you. Thank you. We'll hear from you in a little. Thank you. Your Honor, I'm Gillian Dumas-Beck. I'd like to address Judge Rendell's concerns about what relief might be possible and also the full satisfaction issues. So I will go quickly, unless you interrupt me. We have asked for lesser relief, and as this court has made clear, it's the court's obligation to consider lesser relief. This is a small number of claimants. They're also human beings. They're also sexual abuse survivors. And they're not asking for special treatment. They're asking for the treatment pretty much laid down by the Supreme Court in Purdue and as claimants who preserved their appeals, preserved their objections below, and have now filed appeals to argue their objections. But they are also entitled to relief, not special relief. But we have suggested several types of relief that could apply, including an opt-out just for them from the third-party releases. That does not affect the sale of the insurance policies, because the releases are separate from the insurance policies. They're part of the plan. The releases are the cornerstone of the plan, not the sale. And we could get a release that simply allowed us to pursue the claims against the local councils and chartered organizations without that one asset of the shared insurance rights in BSA's property, because these other entities have their own assets. That's only one form of relief that we asked for. We suggested several others. To the extent that's part of the consideration, and you can anticipate being interrupted, but to the extent that's part of the consideration that is being paid and the opt-outs take that out of the picture, that would seem to increase the cost to the settling insurers. Why doesn't that go straight to the validity of the plan? I guess I'm not being clear. It wouldn't affect the consideration that the settling insurers paid if the settling insurers are still not on the hook under those policies that were sold. As long as the policies remain sold, which we argue the sale is not complete until the money gets transferred. But we're saying we can continue with the releases as for the claims just against the third parties, not against the insurance companies. Those were not consideration for the sale. Yes, the insurance company wanted a release from their obligations under those policies. But that does not mean that our claims on the merits went away against the third-party local councils and chartered organizations. The claims of the chartered organizations and the local councils for coverage under BSA's policies, those were potential claims against the debtor for the debtor's assets, the coverage under those policies. But the claims by third-party sex abuse victims against the local councils and the chartered organizations, those are not visibly those two parties. That does not affect that consideration that the settling insurers wanted. Again, we could go forward with the claims against the release parties without touching that shared insurance policy. That's just possible release, though. This issue is in front of the court on the first time. No lower court considered mootness, either statutory or equitable. As the Supreme Court said in Moak Mall, the appellate court doesn't decide what release is possible as a matter of first impression. This court need only decide that some kind of release is possible given the wide scope of equitable release, and then it would be up to the bankruptcy court to decide what particular release would work. That makes this case unlike the cases in Nordhoff or Energy Future where the appellants were tied into one very specific type of relief. We're open to any types of things that might come up. It was up to the appellees to say that absolutely no possible relief was available, and all they said was, well, you can't reverse the plan and you can't strike the releases. But an opt-out just for us, extra money from the local councils, that's not special treatment within the class because local councils aren't bankrupt. They're non-parties. They're non-bankrupt debtors. So the limitations on treating members of a class differently don't apply. If you'd give me one chance to address the full satisfaction issue. Briefly. The bankruptcy court only made findings as to the likelihood of full payment of settlement value. Settlement value is not full satisfaction. Full satisfaction is a term of art in bankruptcy that applies to claimants who are in classes whose claims are unimpaired. The abuse claimants were in an impaired class. Their rights for their claims were impaired. That's why they're entitled to vote. And the treatment in the plan does not provide for full satisfaction to abuse claimants, unlike the specific express treatment for unimpaired classes under the plan who are promised satisfaction in full by complete payment of their claims. What do we make of the bankruptcy court's finding that there would be full satisfaction in our review for clear error? Ah, no. The bankruptcy court did not make any findings about satisfaction in full or full satisfaction. At most, the bankruptcy court found that the plan was likely, for purposes of confirmation, to pay full settlement value. But settlement value is not the full value of the claims because the claims have never been adjudicated. So no one knows the actual full amount it would take to satisfy the claims. They haven't been measured. So there are no findings that this plan provides for full satisfaction of the claims. And there's nothing in the plan about providing full satisfaction to abuse claimants. Absolutely nothing. At best, it's only full payment of settlement value. And we know that that won't apply here because the settlement trustee herself has said that the claimants are almost certainly not going to be paid full settlement value. Again, that's not full satisfaction. And the one satisfaction doctrine doesn't even come into play unless there's full satisfaction, which there isn't here. And there were no findings about one satisfaction below. That only applies if states only have joint and severable liabilities. The court never considered that. And my clients are from, like, Oregon and California, states that have severable only liability. So the one satisfaction rule doesn't even apply. But it certainly doesn't apply where there's been no full satisfaction. Thank you. Thank you. Thank you. Hello. Delia Lujan-Wolf again for Lujan Claimants. I would just like to hit on some points and then end with effective relief. I'll be quick and answer any questions. Can I ask you a question? You were talking about 363L and its impact on whether this is a sale under B and C or a sale under a plan. And I'm assuming you're referencing under L that the trustee can use sell or lease property under B or C of this section or a plan under 11 may provide for the use, sell, or lease. You draw the distinction that when we come to 363M, it has to be a sale under B or C, not a sale under a plan. Is that your argument? That's exactly correct because Section 363, as expressed in subsection L, clarifies that these are two different transactions. And then in the legislative history of subsection O, Congress, again, did that when it decided not to take out subsection O applying to plan sales and just make it a sale under section 363. Is that in your briefing? It is in our opposition to the settler insurance motion to dismiss. Regarding 363M, we've also made the argument that if it applies to bar direct actions, then it's reverse preempted under the McCarran-Ferguson Act by Guam's direct action statute, which is a statute. We explained how that applies. It's a statute. Every court that's looked at, except for the lower courts, every court that's looked at a direct action statute has held that it is a statute, a state law that applies as defined under the McCarran-Ferguson Act, and so it reverse preempts 363. 363 doesn't even allow an injunction of non-debtor claims anyway, but if it's construed as such, then it would be reverse preempted. Regarding full satisfaction, there's no full satisfaction. The court made it clear that its estimate of the aggregate value was only for purposes of confirmation, specifically to meet the master mortgage factors, which are now invalid under Purdue, that those tests don't exist anymore. And the court also made it clear that its estimate of the aggregate value of claims did not establish the actual value of any single claim or the actual aggregate value of direct abuse claims. And so there has been no finding by the court of actual value of the claims or that they've actually been fully paid or satisfied. The one satisfaction rule cannot apply, and it also doesn't apply when there's direct liability as there is by the non-debtors. Are you saying the court stated specifically that it wasn't establishing actual value? Yes, and that was specifically stated in the confirmation order, and we quoted that in our brief regarding the effect of Purdue. Also, there was mention that the Boy Scouts had contractual indemnification liability. That is not true. They disclosed in their disclosure statement that the court approved and sent out to everybody that they They disclosed that they denied indemnification liability, but that if there was any, that the chartered organizations would be paid by the trust. They also made a claim against the Archdiocese of Bagania, which is a chartered organization. They made a claim for contribution and indemnification for the settlements that they did in Guam for scouting abuse. And we also explained that the annual unit charter agreement, the BSA board resolution, those are not contracts for indemnification, and even if they are, they have conditions that they failed to that the court made no findings that those conditions were met. And so there is no contractual indemnification liability. Effective relief, the plan specifically, the confirmation order specifically says that the settling insurers could enter into an agreement, a settlement, with the Archbishop of Bagania. It's a state. The Archbishop of Bagania is a bankrupt chartered organization who my clients have claims against, most of them. And the plan specifically says in the confirmation order that the settling insurers can reach a settlement with the Archdiocese, with the estate, or with the creditors, which includes Wuhan claimants. And so built into the plan and the confirmation order is relief that can be granted regardless of the sales. So that's relief that can be granted. There's also, again, built into the agreement, as cited by the settling insurers in their reply, they said that they can't entangle the money that they paid for two things, the policies and the releases. They're a complete piece. That is not true. What they have just said in their reply is that if the plan is reversed or modified or changed in some way, the confirmation order is not unappealable or not appealable, then they keep the policies, but they get back the escrowed money because they don't have protection anymore as protected parties. And so built into these agreements, these settlements, is that, yes, you can have a valid sale. Okay? 363M is only protecting that, the validity of the sale. You can't have a valid sale of the policies or you can't have a valid sale of property, but you can still – what they're saying is they're going to get their money back because people can sue them because they're no longer protected parties. And so the insurance settlements untangle the policies from the money that they paid into escrow and the releases themselves. I'll give you a minute to wind up. Yes. And I just wanted to also add that the contractual liability, that is something that's usually required, the automatic liability, in order for the shared insurance to lead to a finding of subject matter jurisdiction. We don't have that here, so the shared insurance is not enough. We also argue that the proceeds, Your Honors, are not part of the insurance – I'm sorry, part of the estate. Other things that are not a part of the estate, they can't make local council policies a part of the estate because they were not obtained using pre-petition estate property. And so the local council policies cannot be sold under 363 and enjoy the benefits of 363M because they're not – they never became estate property. Thank you. We appreciate this point. We're brief as well. I will be brief. We're not seeking an advantage, Your Honor. We're asking that this court give us language that preserves what this court said in combustion engineering, that we have contractual rights which will be decided based on the policies and not on anything else. State law, of course. The problem is compounded by what both the district court and the bankruptcy court said, which is, I will not tell the circuit – I will not tell the coverage court how to interpret this, this brick of information. So it now is up to the coverage court, and that is improper. The policies have not been transferred. It's interesting that the settling shareholders – the settling insurers transferred their policies, but the plan specifically says it's transferring rights but not the policies themselves in parentheses, but not the policies. That flies in the face of the commonerate principle and a bedrock principle that the assignee or the transferee stands in the shoes of the party that transferred. That's what we're asking to be preserved. And so far as the language, we want the commonerate language, and I want to be very clear where I don't believe it's adding a new advantage to the insurers. On page two of our reply brief, we have two provisions. Nothing in the TVPs shall affect, impair, or prejudice the rights and defenses of the non-settling insurance companies in any manner, period. That's the language that we're asking for. It is comparable to the language that is in all the plans that we brought to the attention of the court, including those from the Third Circuit. The other is this. A decision by the settlement trust to pay or not to pay any submitted abuse claim shall not be used and be admissible as evidence in binding or have any res judicata, collateral estoppel, or other preclusive effect in any lawsuit or other proceeding against another entity other than the settlement trust. All that we are asking is that whatever happens in the bankruptcy court, and this again is in the other plans that we've identified, is not res judicata or binding, and not anything, the decision to pay a particular amount. In other words, the trustee cannot say, should not be allowed to say, because I followed what's in the plan, that's what you owe me. That's what we do not want. That's what we're trying to get at with that language. And, Your Honors, we are very sensitive to the timing issue, and we understand what that means to the claimants. That's why we proposed the specific language that BSA had proposed, and we think that it's appropriate to add it because if you just send it back or you just say that, oh, our rights are preserved, we still have the problem of the plan, and if we simply go back without express language, there may be litigation over what it has to be. We are giving you this language because we think that it will streamline anything that happens thereafter. And, by the way, nothing in the Bankruptcy Code permits an assignment of rights without obligations. They simply don't have that right, and the jurisprudence of this circuit makes it clear. I think with respect to what the trustee is doing, and we did hear one comment that lawyers are very creative, but by making 600 pages of documents and provisions that are designed not to impair or have any effect on insurers, somehow imposed on the insurer invites creativity that really has no place in the coverage court. I ask that you look at paragraphs 110 and footnote 2 and paragraphs 131 of the trustee's complaint, and we ask you to take judicial notice of that. We think that it is trying to play and parlay the plan into an advantage for the trustee. We are seeking to have the bedrock principle that our rights in the insurance policies, our defenses and the trustees' rights are unchanged by virtue of the bankruptcy law, except with respect to the anti-assignment provision where it is applicable. That's it, and that's what our changes make clear. There was a reference, and I'll spend 15 seconds if I can. There's a reference to the fact that this is a closely integrated transaction and that somehow if we get what we're asking for, somehow the whole thing blows up. It's just to say so. It's not really demonstrated by anything if these changes were made, but we ask you to look at and take notice of the fact that when the vote occurred on this plan, there were a bunch of provisions, including some anti-insurer provisions that were knocked out by the bankruptcy court, and we don't have a problem with what she knocked out. We do have a problem with what was retained. After that, there was no revote. There was no, oh, my goodness, we didn't get what we were asking for, so everything goes away. We think that that demonstrates that the relief that we're seeking is in many ways harmless to the overall effect of the plan. Finally, just one last thing. In our good faith section, which by the way, truck was a good faith case, is a good faith case, we seek two changes that are very specific, and I invite the court to review the back end of our papers to see what our position is on that language. With that, unless you have anything for me, Your Honors, I will sit down. Okay. Thank you. Thank you very much. Yes, it is afternoon. Good afternoon, Your Honors. Harris, Winsbrough, Navaffe, the Alliant Insurers. Just real briefly, the FCR raised that we hadn't raised our objections until the very end. That's just not accurate. When the plan was solicited out, there was no judgment reduction clause. We actually objected on that basis that we had these claims that are being enjoined, and we objected. They filed another plan. We objected. We got to the confirmation hearing. There's a transcript. I argued that. We objected again and asked for it. So we repeatedly asked throughout the process for relief from these injunctions, and I would submit to the court you could look at pages 17 through 20 of our opening brief, and we outlined those record sites. I can cite them. I don't want to waste the court's time with that. The other point with respect to that was there was a concept. This plan is integrated as a whole, kind of the chicken little argument this court has brought about over the years and been not a basis for mootness. And here, the clause, the judgment reduction clause, you're being asked to say is okay by the appellees. It wasn't solicited out for vote. It came after the fact. So it's impossible for the claimants who voted to have relied on what they're now claiming you should rely upon. The other point I would make is there was a comment about, well, only abuse claims are in the trust. But that's not true either. There are indirect abuse claims, claims that are contribution and other rights that are also channeled to the trust. So the idea that only abuse claims are in the trust is just not accurate. There was a comment about adequate protection. Well, if we were looking at adequate protection in its truest sense under 363, that would be our claims would attach to the proceeds that are in the trust. That gets to the same place that we would be with the trust backstop. So whether we get looked at for medical protection in a classic sense under 363 or whether the trust backstop, which we have proposed, it gets us to the same place. Your Honor, I had a question about that. Well, maybe I need a remand because there could be a finding on the reduction of defense costs. We would submit that that whole framework of a net benefit is inapplicable to this case. Under Purdue, we're entitled to be paid. To the extent that there is a net benefit, that analysis relied on plant and the plant decision, and even the Ninth Circuit in plant specifically says we are relying on a specific statute under 524G to say we can do this. And then when the Ninth Circuit went on to distinguish that from Dow Corning and other cases that talk about non-debtor releases where you need to have a mechanism to pay the claims in full and said those don't apply here. So for all those reasons, we respectfully submit that the court should adopt the language that has been attached to our opening papers, our remand with instructions. And thank you for the court's patience and time. It's been tremendous. Thank you. Well, we thank all counsel. The extent of work that's gone into the really superb briefing that we've gotten from the parties and from Anneke in this case is very helpful to the court in working through this very important case. We'd ask that a brief be prepared. The parties can divide up costs. I'm sorry, a transcript be prepared and the parties can divide up the costs. And we'll take the case under advisement. Thank you. Thank you. The hearing stops.